THE SIERRA CLUB, a not for profit corporation organized under the laws of the State of California, et al., Plaintiff,

v.

Michael DOMBECK, in his capacity as chief of the United States Forest Service, Eleanor Towns, in her capacity as Regional Forester of the United States Forest Service, Defendants.

No. 00–421–PHX–PGR.

United States District Court, D. Arizona.

Sept. 12, 2001.

Steve W. Berman, Hagens & Berman LLP, Seattle, WA, Steven C. Mitchell, Howard Marc Shanker, Hagens Berman & Mitchell LLP, Phoenix, AZ, for Sierra Club and Center for Biological Diversity.

Albert C. Lin, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, Lois J. Schiffer, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, Ann Elizabeth Harwood, U.S. Attorney's Office, Phoenix, AZ, for Michael Dombeck and Eleanor Towns.

David S. Neslin, Harris D. Sherman, Ezekiel J. Williams, Arnold & Porter, Denver, CO, for Canyon Forest Village II Corporation.

## ORDER

ROSENBLATT, District Judge.

Pending before this Court is plaintiff Sierra Club's Motion for Summary Judgement (Doc # 48–1); intervenor Canyon

Forest Village's (CFV) Motion for Summary Judgement (Doc. # 37–1); defendant United States Forest Service's (Forest Service) Motion for Summary Judgement (Doc. # 40–1); the Forest Service's Motion to Strike Three Extra Record Items from the Record (Doc. # 52–1); Sierra Club's Cross–Motion to Strike the Hyatt declaration, the Gillet affidavit, and the newspaper article (Doc. # 62–1); the Forest Service's Motion to Dismiss (Doc. 90–1) or in the alternative, Motion to Stay (Doc. 90–2).

## PROCEDURAL HISTORY

Plaintiff is the Grand Canyon Chapter of the Sierra Club. On March 8, 2000, Sierra Club filed a Complaint seeking declaratory and injunctive relief for violations of the National Environmental Policy Act, 42 U.S.C. § 4321 (NEPA), the Administrative Procedures Act, 5 U.S.C. § 701—706 (APA), and the Federal Land Policy and Management Act 43 U.S.C. § 1701 *et. seq.* (FLPMA).

Michael Dombeck is a named defendant in his capacity as Chief of the United States Forest Service. Defendant Eleanor Towns is named in her capacity as the Regional Forester for Southwestern Region of the United States Forest Service. On August 6, 1999, defendant Towns approved a land exchange on behalf of the Forest Service. On September 27, 1999, the Sierra Club appealed the decision of defendant Towns. Thereafter, defendant Dombeck had ultimate responsibility for the appeal process. The Forest Service's decision was administratively appealed, and affirmed on November 10, 1999. Judicial review was sought in this Court on March 3, 2000 when Sierra Club filed the Complaint. The First Amended Complaint was filed on October 16, 2000.

Sierra Club's First Amended Complaint alleges the following: (1) Count I—the Record of Decision (ROD) and the Final Environmental Impact Statement (FEIS) are based on commitments in documents that do not appear in the record; (2) Count II—the ROD and FEIS fail to adequately analyze the environmental impacts of the water supply scenario on groundwater; (3) Count III—the ROD and FEIS fail to adequately analyze the environmental impacts of the water delivery system, improper segmentation; (4) Count IV—failure to consider direct, indirect and cumulative impacts; (5) Count V—failure to consider reasonable alternatives; (6) Count VI—failure to take the requisite "hard look" at the environmental impacts of the selected alternative; (7) Count VII—improper tiering; (8) Count VIII—the administrative record does not support the decision that Alternative H satisfies the public interest requirements under FLPMA. Counts I through VII involve alleged NEPA violations, Count VIII involves FLPMA.

On April 9, 2001 CFV was permitted to intervene in this matter and participate in all aspects of the litigation. CFV is a party to the land exchange at issue.

The parties to this action have filed cross-motions for summary judgement. They were taken under advisement following oral arguments on April 23, 2001. While under advisement, the Forest Service decided not to proceed with the development project based on an adverse decision rendered by the district court in the District of Columbia in a separate but related case involving the same land transaction. Accordingly, the Forest Service filed a Motion to Dismiss or alternatively, Stay Proceedings based on the decision to further study the land transaction at issue. The Motion to Dismiss was filed on June 13, 2001.

## FACTUAL HISTORY

In 1987 the Forest Service adopted a Land and Resource Management Plan for the Kaibab National Forest that provides direction for managing the lands under its

control. The forest plan identified the objectives of acquiring private inholdings in the Tusayan Ranger District and of generating and considering proposals for use of land in the Kaibab National Forest for expansion in the Tusayan area.

In 1994, CFV submitted a proposal to the Forest Service to transfer twelve inholdings within the boundaries of the Tusayan Ranger District in exchange for 272 acres of forest land adjacent to Tusayan, to be used for a transportation center, commercial development, housing, and community facilities.

Ultimately, the Forest Service approved Alternative H, proposed by CFV. This alternative consisted of an exchange of 272 acres of forest land for twelve inholdings, using Colorado River water (as opposed to groundwater) as its primary water supply and the adoption of a sustainable design feature.

Regional Forester Towns found that Alternative H best met the objectives considered in the Environmental Impact Statement (EIS), more effectively implemented the Forest Plan, and best served the greater public interest. Among the reasons cited in support of the decision were; the decision provided needed improvements to the Park transportation system, consolidated land ownership and prevented piecemeal development, protected cultural resources and plant and wildlife habitat on the inholdings, reduced risks and impacts to Grand Canyon seeps and springs, and provided a centralized, improved land base for housing area employees, as well as land base, building space, and funds for community activities.

Under Alternative H, water will be imported from the Colorado River to the new gateway community. This water would be transported by rail car from the Colorado River to an area called Maine Siding about 60 miles south of the new gateway community. The Forest Service has explained that there is no proposal yet for transporting the water the final 60 miles from Maine Siding, but two options are possible. The first option allows water to continue by rail to Apex Siding just south of Tusayan and then conveyed to the CFV development by pipeline. The second option calls for the water to be delivered via a 60–mile underground six-to-eight inch pipeline from Maine Siding to the CFV development. The Forest Service has described both options and discussed their environmental impact. They also have acknowledged that the implementation of either option will require additional NEPA analysis.

However, neither the ROD nor the FEIS considers the environmental consequences of constructing and operating the CFV water delivery system. The FEIS notes that the transport of water by rail from Williams to Apex Siding would require additional trains that would affect air quality and that the construction of an underground pipeline could result in impacts to natural and cultural resources. The FEIS does not analyze these air quality impacts or the impacts to natural and cultural resources. Also, the FEIS provides that groundwater from a well would be pumped in emergency situations and during initial construction. The FEIS includes no analysis or consideration of the amount of groundwater that could be used during a multi-year construction project of this magnitude, or the potential use during a vaguely defined "emergency."

The Forest Service determined that certain potential impacts of the proposed gateway community under Alternative H will be mitigated through two covenants that will be finalized and recorded to restrict the uses of the federal lands obtained by CFV in the exchange. The draft Declaration of Covenants for Sustainable Water Use prohibits CFV from using

groundwater except during emergency situations. It ensures that construction and operation of the proposed gateway community will utilize water recycling, efficient construction, solar power, reduced energy consumption, and other sustainable development principles.

In addition, the FEIS does not evaluate the environmental impacts of pumping water at Topock, Arizona, or the impacts associated with storage facilities at Williams and Tusayan. The FEIS also fails to consider the viability of the complex water delivery system.

On March 15, 2000, the County Board of Supervisors for Coconino County approved a CFV requested zoning ordinance. However, the ordinance and the land transfer were stayed pending a referendum held in Coconino County on November 7, 2000. The November 7, 2000 referendum stated that the ordinance amended the county zoning map on application of the United States Forest Service by CFV for a zone change from "open space" to "planned community" on 272 acres located south of the Grand Canyon, allowing lodging, retail, employee housing, and community facility uses, with 63 conditions. The referendum rejected the rezoning efforts. As a result, the Board of Supervisors' decision was invalidated and there is no zoning for any aspect of the lands encompassed by Alternative H other than as open space. Coconino County Zoning Ordinances prohibit CFV from seeking rezoning on the same parcel for at least one year following the denial by the voters. At the oral argument on April 23, 2001, CFV represented to the Court that they would be preparing a new rezoning application for submittal to the county in the immediate future. The Court is unaware if the application was ever filed in light of the Forest Service's representation that further study is to be undertaken.

## DISCUSSION

### Motion to Dismiss

█ The Forest Service recently determined that further environmental analysis with respect to the water delivery system and use of groundwater associated with Alternative H is necessary. The Forest Service will then further evaluate the Tusayan land exchange. This decision was made in response to a Memorandum Order issued by the district court in the District of Columbia. The Order was issued in a different case involving the same land exchange, some of the same causes of action, but different parties. The District of Columbia court held that further environmental analysis was necessary under NEPA before the land exchange could be considered.

Accordingly, the Forest Service believes that judicial review at this time, of the August 1999 Record of Decision and its supporting documentation, is premature. The Forest Service also argues the matter should be dismissed because the agency's action is no longer final. They maintain that whether viewed through the doctrines of ripeness or finality, the instant litigation does not present a live case or controversy at this time and should be dismissed. Sierra Club opposes the Motion to Dismiss. Sierra Club argues that this matter is still ripe for consideration because ripeness is determined at the time the Complaint is filed.

█ It is well settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152. "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id.,* at 289, n. 10, 455 U.S. 283, 102 S.Ct. 1070 (citing, *United States v. W.T. Grant*

*Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). In accordance with this principle, the standard announced by the Supreme Court for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth v. Laidlaw,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), *citing, United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968).[1] The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *See Friends of the Earth,* 528 U.S. at 189, 120 S.Ct. 693.

■ Moreover, ripeness is determined at the time of the filing of the complaint. *See Bradley v. Work,* 916 F.Supp. 1446, 1464 (S.D.Ind.1996). In cases such as the one pending before this Court, ripeness is also determined when the agency action was sufficiently final. *See* 40 C.F.R. § 1501.4(e)(2); *see also Friedman Bros. Inv. Co. v. Lewis,* 676 F.2d 1317, 1319 (9th Cir.1982).

This case was sufficiently ripe and the agency decision was final at the time the Complaint was filed. In fact, at no time, until the filing of this Motion, has the Forest Service argued that the matter should be dismissed on the basis of ripeness or that agency action was not final.

■ Alternatively, the Forest Service requests this matter be stayed pending additional analysis in the interest of "judicial economy." Staying the action under

these circumstances is clearly not warranted. Assuming in arguendo, that the matter was stayed for further analysis, any further intervention by this Court may not be necessary. Assuming intervention would be necessary, the allegations may change, the facts will change and even some of the parties are likely to change. Ultimately, this Court would likely be presented with an entirely new case or no case at all. Simply stated, allowing the parties to litigate an entirely new agency action under this case name and number is totally inappropriate. Rather, this Court should reach its decision on the Cross–Motions for Summary Judgement, allowing the parties to take the Court's opinion into consideration while undertaking further analysis, then the parties can file a new challenge to the agencies second "final decision" if necessary.

It would also better serve judicial economics for this Court to issue an Order on the pending Cross–Motions for Summary Judgement because the Motions have been fully briefed, argued, and taken under advisement by this Court on April 23, 2001. There is essentially nothing for this Court to stay, other than the Court's ruling.

### Motions to Strike

■ Under the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *see also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ Consideration of evidence outside the administrative record to deter-

---

**1.** This Court recognizes that the Forest Service argues dismissal on ripeness grounds, not mootness. However, *Friends of the Earth v. Laidlaw,* discusses a very similar situation in terms of mootness instead of ripeness. *See* *Friends of the Earth v. Laidlaw,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (a case involving similar environmental challenges, where the defendant voluntarily ceased the activities complained of).

mine correctness or wisdom of an agency's decision is not permitted, even if the court has also examined the administrative record. *See Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1160 (9th Cir.1980). If a court determines that an agency's course of action was insufficient or inadequate, it should not compensate for the agency's dereliction by undertaking its own inquiry into the matter. *See id.*

The above standard applies to all actions brought under the APA, including actions involving the NEPA. *See Friends of the Earth v. Hintz,* 800 F.2d 822, 829 (9th Cir.1986).

■ Extra record items may be considered by a court under limited circumstances, such as: where "there was such failure to explain administrative action as to frustrate effective judicial review," *Camp v. Pitts,* 411 U.S. at 142–43, 93 S.Ct. 1241; "when it appears the agency has relied on documents or materials not included in the record." *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988); "when supplementation of the record is necessary to explain technical terms or complex subject matter," *id.;* or when plaintiffs make a "strong showing" of agency bad faith. *Id.* at 1437.

■ If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information or for the limited purpose of ascertaining whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision. *See id.*

■ In some instances, a court may, at its discretion, allow supplementation by the plaintiff if, the administrative record compiled by the agency excludes evidence adverse to its position. *Jean v. Dep't of Labor,* 1989 U.S.Dist.LEXIS 7403 (D.D.C. 1989). Arguably in an administrative matter such as this, Sierra Club does not have the same opportunity to contribute to the record to the same extent as the Forest Service and CFV. Thus, in striking the extra record evidence, the Court's entire review would be based solely on a record created by defendants.

■ Nonetheless, the burden is on the party seeking to introduce the extra record materials. *See Animal Defense Council,* 840 F.2d at 1436.

In this case, the Forest Service seeks to strike three extra record items submitted by the Sierra Club in support of its Motion for Summary Judgement: (1) the affidavit of Dennis Lund[2]; and (2) excerpts from a June 22, 2000 General Accounting Office report; and (3) excerpts from a June 22, 2000 news article from the *Arizona Daily Sun.* Sierra Club moves to strike the following extra record items: (1) the declaration of Wayne Hyatt; (2) an affidavit of Tom Gillett; and (3) a May 24, 2000 newspaper article.

Neither party has sustained their burden with respect to introducing extra record items. None of the possible exceptions apply, as the extensive record provides an ample basis for this Court's

---

**2.** Per Sierra Club's Motion for Summary Judgement, "[o]n November 14, 2000, Dennis Lund provided plaintiff with an affidavit that *explains and clarifies* the administrative record…Mr. Lund admits, in part, that he and the Forest Service (1) failed to consider viable alternatives; (2) wrongly relied on Draft Covenants for water use and development; and

(3) failed to consider the environmental impacts of the water delivery system. Mr. Lund also confirms that this land exchange is likely not in the public interest as required by FLPMA." This Court is unclear as to how this information "clarifies" the administrative record.

review. The materials introduced were not relied on by the agency in making its decision, they do not purport to explain technical terms or complex subject matter, and there is no strong showing of bad faith. While exceptions to the general rule exist, they are implemented at the Court's discretion. In *Animal Defense Council v. Hodel* the Court restricted review to the administrative record reasoning that the administrative record and the EIS contained adequate information to respond to the allegations. 840 F.2d 1432, 1436 (9th Cir.1988).

At best, Sierra Club's extra record evidence should be considered by this Court because they were at a distinct disadvantage in contributing to the administrative record. However, the review of the extra record evidence presented by Sierra Club is unnecessary to this Court in terms of evaluating the agency record. The Lund affidavit, in particular, consists of mostly argument.

Because none of the reasons for extending review to items outside the administrative record exist, all items at issue are stricken and the Court will proceed with a ruling on the merits without consideration of the aforementioned items.

**Motions for Summary Judgement**

*A. Standard of review*

■ In reviewing administrative agency decisions, the function of the district court is to determine whether or not as a matter of law, evidence in the administrative record permitted the agency to make the decision it did, and summary judgement is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did. *See City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir.1997).

■ A person suffering legal wrong because of an agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. 5 U.S.C. § 704. Under the APA, a court may overturn agency action only if the action was "arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. To determine whether agency action was arbitrary or capricious, a court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgement." *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)[3].

■ With respect to reviewing the FEIS the court must determine whether it

**3.** This Court notes that the parties disagree as to which standard of review applies in this matter. Sierra Club asserts that a de novo standard should apply because this Court is determining questions of law. The Forest Service and CFV maintain that review is limited by the arbitrary and capricious standard. This Court's review of the relevant law reveals that the arbitrary and capricious standard is the appropriate standard. Numerous annotations to 42 U.S.C. § 4332 state that an agency's decision as to whether a particular project meets environmental standards should be subjected to a review on the merits to determine if it is in accordance with the substantive requirements of this section; *but review should be limited* to determining whether the agency's decision is *arbitrary* and *capricious* and the Court should not be empowered to substitute its judgement for that of the agency. *See Leavenworth Audubon Adopt–A–Forest Alpine Lakes Protection Society v. Ferraro*, 881 F.Supp. 1482 (W.D.Wash.1995) (emphasis added); *see also Sierra Club v. Froehlke*, 486 F.2d 946 (7th Cir.1973); *Environmental Defense Fund v. Army Corps of Engineers*, 470 F.2d 289 (8th Cir.1972).

contained "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992). The court must make a "pragmatic judgment whether the [F]EIS's form, content and preparation foster both informed decision-making and informed public participation." *See id.* In determining whether the FEIS contains a "reasonably thorough discussion" a court may not "fly speck the document and hold it insufficient on the basis of technical deficiencies...." *Swanson v. United States Forest Service*, 87 F.3d 339, 343 (9th Cir.1996). That is to say, once the court is satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, the review is at an end. *See Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir.1998).

## B. National Environmental Policy Act

The Congress authorizes and directs that, to the fullest extent possible:...
(2) all agencies of the Federal Government shall -

 (C) include in every recommendation or report on proposals for legislation and other major federal action significantly affecting the quality of human environment, a detailed statement by the responsible official on -

 (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between the local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would

be involved in the proposed action should it be implemented...

42 U.S.C. § 4332.

 NEPA is essentially a procedural statute. *See Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1382 (9th Cir.1986). This Circuit employs a "rule of reason" that asks whether an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *See California v. Block*, 690 F.2d 753, 761 (9th Cir.1982). The district court must make a "pragmatic judgement whether the EIS's form, content, and preparation foster both informed decision making and informed public participation," *Id.* A FEIS may be found inadequate under NEPA if it does not reasonably set forth sufficient information to enable the decision maker to consider the environmental factors and make a reasoned decision. *See Northwest Indian Cemetery Protective Ass'n v. Peterson*, 795 F.2d 688, 695 (9th Cir.1986).

### 1. Exhaustion of Administrative Process

 As a threshold matter, CFV argues that this Court should dismiss Counts V, VII, VIII and, most of Counts IV and VI for failure to exhaust administrative remedies.

 In general, a plaintiff must exhaust administrative remedies prior to filing a claim for judicial review in federal court when required by statute or regulations and the agency action is stayed during the administrative appeal process. *See Darby v. Cisneros*, 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

 Under the APA, review is available where the challenged agency action is "final." *See Clouser v. Espy*, 42 F.3d 1522, 1531–32 (9th cir.1994). In addi-

tion, under the related but distinct doctrine of "exhaustion,"

> an appeal to superior agency authority is a prerequisite to judicial review [under the APA]...when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review.

*Darby v. Cisneros,* 509 U.S. 137, 152, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

 However, the requirement that administrative remedies be exhausted is not applicable in cases where resorting to the agency would be futile. *See Clouser v. Espy,* 42 F.3d at 1532–33 (9th Cir.1994). Sierra Club seeks to avoid dismissal by arguing the applicability of the futility doctrine. The weight of authority supports Sierra Club's position.

> [T]here is no requirement of exhaustion where resort to the agency would be futile.... Where the agency's position on the question at issue appears already set, and it is very likely what the result of recourse to the administrative remedies would be, such recourse would be futile and is not required.

*See SAIF Corp. v. Johnson,* 908 F.2d 1434, 1441 (9th Cir.1990); *see also Clouser,* 42 F.3d at 1532–33; *El Rescate Legal Services, Inc. v. EOIR,* 959 F.2d 742, 747 (9th Cir.1991); *Silver v. Babbitt,* 924 F.Supp. 976, 987 (D.Ariz.1995); *Order of R. Conductors v. Swan,* 329 U.S. 520, 67 S.Ct. 405, 91 L.Ed. 471 (1947); *White Apache Tribe v. Hodel,* 840 F.2d 675, 677 (9th Cir.1988).

Here, CFV alleges that Sierra Club did not exhaust its administrative remedies insofar as the administrative appellate brief does not argue that the Forest Service failed to identify reasonable alternatives to Alternative H, that it was improperly tiered, or that the land exchange was not in the public interest. Moreover, CFV maintains that Sierra Club did not raise in its administrative appeal most of the allegations in Counts IV and VI. Counts IV and VI allege that the Forest Service violated NEPA by inadequately evaluating numerous issues and potential environmental effects of the land exchange. The Forest Service argues that Sierra Club exhausted its administrative remedies for only two of the allegations in Counts IV and VI, the allegations that the Forest Service did not sufficiently consider the effects of groundwater use and constructing and operating the water delivery system.

Sierra Club claims that it did, in fact, exhaust all administrative remedies with regard to all Counts in the Amended Complaint. In their opposition, Sierra Club argues that throughout the administrative process they discussed the Counts at various times. This Court, however, notes Sierra Club's failure to point out where in the administrative appeals process they argued each specific Count despite the detailed nature of their briefs.

Regardless, it is clear from the record that the futility doctrine applies to the circumstances presented to this Court and the Court will render a ruling on the merits.

**2. Water delivery system as a connected action**

 Per 40 C.F.R. § 1508.25(a)(1) all "connected actions" must be discussed in the same impact statement. Actions are connected if they: (i) automatically trigger other actions which may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously; (iii) are interdependent parts of a larger action and depend on the larger action for their justification. 40 C.F.R. § 1508.25(a)(1).

Alternative H proposes to import water from the Colorado River, as opposed to using ground water to supply the develop-

ment. The Forest Service and CFV intend to transport water from a siding near Topock, Arizona, to Maine Siding, near Williams, Arizona. However, the Forest Service and CFV acknowledge that there is no proposal in place for transporting the water from Maine Siding to the development, but that two options are possible: (1) water may be transported via rail from Maine Siding to Apex Siding near Tusayan and then via underground pipeline from Apex Siding to the development; or (2) water may be transported via underground pipeline to the development. The FEIS addressed the water delivery system and concluded that further analysis under NEPA was necessary before either option was chosen.

Sierra Club contends that postponing the decision regarding the water delivery system, and not including a full evaluation of the two options, is not permitted under NEPA.

■■■ The Forest Service acknowledges that it chose to defer evaluation of the water delivery options until more detailed information would be available. They further argue that the pipeline options mentioned in the FEIS are not yet proposals which require analysis under NEPA, but rather apparent alternatives. NEPA "speaks solely in terms of proposed actions; it does not require an agency to consider possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). The transportation of water to the CFV development is clearly not a "less imminent" action.

Further, the Forest Service argues that they may phase their NEPA analysis. This is referred to as tiering. However, tiering refers to the coverage of

general matters in broader environmental impact statements (such as national programs or policy statements) with subsequent narrower statements or environmental analysis (such as regional or basin wide program statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. 40 C.F.R. § 1508.28 [4].

The record clearly establishes that Alternative H is dependant on obtaining an adequate supply of water both during construction and following its completion. Without a water delivery system the selected alternative cannot be implemented. While the Court believes that a water delivery system is necessary for construction of the project and obtaining inhabitants to the area, it absolutely must be available for emergencies at all times and during construction. Therefore, without a water delivery system the development cannot be constructed and without the contemplated construction, a water delivery system would not be needed. It is illogical to maintain that the development and the water delivery system are not connected actions.

Based on the administrative record before this Court, the water delivery system and the CFV development are considered clearly connected actions and should have been properly addressed in the FEIS as required by 40 C.F.R. § 1508.25(a)(1). In fact, any decision otherwise is considered by this Court to be arbitrary and capricious.

### 3. Consideration of reasonable alternatives

■■■ The Code of Federal Regulations requires that reasonable alternatives be considered. 40 C.F.R. § 1502.14 (1998).

In this section agencies shall:

---

**4.** This issue is discussed below in greater de- tail.

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
(c) Include reasonable alternatives not within the jurisdiction of the lead agency.
(d) Include the alternative of no action.
(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14

 "An agency's discussion of alternatives must be bounded by some notion of feasibility." *Muckleshoot v. United States Forest Service,* 177 F.3d 800, 814 (9th Cir.1999). An agency need not consider every available alternative. *See Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1180 (9th Cir. 1990). The range of alternatives is reviewed under a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a reasoned choice. *See id.* NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences. *See id.* at 1181.

 However, NEPA does require federal agencies to rigorously explore and objectively evaluate all reasonable alternatives. With respect to alternatives that were eliminated from detailed study, NEPA requires a brief discussion of the reasons for their elimination. 40 C.F.R. § 1502.14(a). "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059,

1065 (9th Cir.1998); *see also Muckleshoot,* 177 F.3d 800, 814 (9th Cir.1999).

In this matter there are numerous reasonable but unexamined alternatives; purchasing the inholdings, considering a modified land exchange alternative on a smaller scale, considering any alternative that relied on the use of special use permits designed to meet the needs of the GMP (such as alternatives E and F in the FEIS) or, even no action.

In fact, in the context of a challenged Forest Service land exchange attempting to consolidate inholdings, the Ninth Circuit has already held that:

[t]he plaintiffs also argue that the land could have been purchased outright with funds from the Federal Land and Water Conservation Fund. While the Forest Service itself cannot appropriate these funds, it can request them. The records reflect that such a request was never made, and indeed, this option was not even considered...This alternative clearly falls within the range of such reasonable alternatives, and should have been considered.

*Muckleshoot Indian Tribe,* 177 F.3d at 814.

### 4. Proper consideration

 NEPA imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions. *See Inland Empire Pub. Lands v. United States Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996)(holding that NEPA is concerned with the process of disclosure, not with the result). NEPA "ensures that the agency...will have available, and will carefully consider, detailed information concerning significant environmental impacts"; *it also guarantees that information will be made available to the larger public audience.* See *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th

Cir.1998) (emphasis added); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

Sierra Club contends that the ROD/ᵥ FEIS state that enforcement of all of the development and water use provisions would be governed by the use of two covenants. These covenants will run with the title to the land, will be binding on CFV and all future landowners, and will apply in addition to the zoning restrictions to be imposed by the County.

The covenant for water use will prohibit the construction of groundwater wells on the federal land conveyed to CFV and will prohibit the use of groundwater obtained from the Coconino Plateau groundwater subbasin at CFV, except in emergency situations and during construction.

The covenant for sustainable development is intended to ensure implementation of the sustainable development practices proposed by CFV and will establish the Kaibab Institute, the Sustainability Review Board, and other community associations.[5] Both covenants will identify specific benefitted parties—including the Forest Service, Park Service, local Native American tribes, and other independent entities—that will have the power to administer and enforce the covenants.

Sierra Club alleges that neither of these two covenants were available for review prior to the issuance of the FEIS. Moreover, the Forest Service only generally describes these covenants in the FEIS, as opposed to providing the detailed discussion of mitigation measures required under NEPA. Neither of the two covenants referred to in the ROD and FEIS were included in the ROD or FEIS or the appendices thereto. In fact, Sierra Club requested copies of these documents on August 30, 1999 (following public distribution of the ROD/FEIS) and the Forest Service replied:

> ...these documents are not reproduced in the ROD or the FEIS, but they are part of the administrative record for the EIS. The concept of covenants, and other governance agreements, are described in detail in the FEIS and are referenced in the ROD.

The initial draft of the Declaration of Covenants for Sustainable Development for Canyon Forest Village appearing in the administrative record is dated July 27, 1999. The record indicates that the FEIS was completed, printed, and bound prior to July 28, 1999, at which time the final version was forwarded to the United States Environmental Protection Agency.

On August 31, 1999, 25 days after the ROD and FEIS were distributed to the public, the Forest Supervisor sent the Draft Covenants to the Regional Forester indicating a desire to meet and discuss whether the draft covenants met the intent of the governance provisions described in the ROD and FEIS.

The Forest Service claims the draft covenants were in development from at least the beginning of 1999. They claim that between early 1999 and August of 1999, the drafts were refined to ensure compliance with various regulations. Moreover, the Forest Service claims that the public had access to the materials but they were made available only upon request.

The covenants should have been finalized before the exchange was approved. The Office of General Counsel and the Regional Forester should have reviewed the covenants and determined that they

---

**5.** These organizations will have the powers and duties to carry out ecological monitoring, restoration, conservation, to regulate construction plans and activities and, to maintain and enforce design guidelines.

met "the intent of the governance provisions as described in the EIS" before the ROD/EIS were finalized. The Forest Service's failure to carefully consider these documents and make them available to the public prior to approving the land exchange, violates NEPA and is clearly erroneous.

### 5. Cumulative impact of the delivery system

■ The relevant regulations provide that a FEIS should include "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2). A cumulative impact is defined as, "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

In essence, Sierra Club maintains that the FEIS did not adequately consider the cumulative impacts of groundwater pumping during construction of the project and for emergencies. The FEIS states that two pumping scenarios were simulated based on a projected minimum and maximum pumping rate to evaluate cumulative impacts. Yet there is no subsequent evaluation of either of the scenarios provided in the FEIS.

The Forest Service concedes that the FEIS analysis of the use of groundwater is lacking, but argue that such insufficiency is moot in light of the zoning ordinance. Regardless, CFV will be required to find water from another source.

Again, it is illogical to contemplate that the cumulative impact of the development was properly assessed when the Forest Service did not know what type of water delivery system would be put in place. Assuming the water was delivered via pipeline there would be significant environmental impacts. Alternatively, if the water was delivered by rail there would also be significant, but different, environmental consequences.

Thus, whether the Forest Service was required to analyze the cumulative impact of the use of groundwater or some other source during construction or emergencies, some analysis should have been performed assessing all viable delivery systems. Therefore, the assessment of the cumulative impact of the development is insufficient.

### 6. Decision supported by the record

■ It is well established that an agency's decision must be supported by the administrative record. *See Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Desert Citizens Against Pollution v. Bisson*, 954 F.Supp. 1430, 1436 (S.D.Cal.1997). Mere disagreement with an agency's policies, methodologies, and conclusions does not render the decision arbitrary and capricious. *See Alliance IFQs v. Brown*, 84 F.3d 343, 352 (9th Cir.1996).

Sierra Club argues that the Forest Service's decision was not supported by the record because it is contrary to various goals set out in the GMP and to the Forest Service's stated objective of facilitating better land management.[6] This Court is troubled by the use of the GMP as a determinative criteria for deciding what is

---

**6.** The Park's General Management Plan (GMP) was adopted by the National Park Ser- vice in 1995.

in the best interest of the Grand Canyon National Park but concurs with Sierra Club's position.

In the instant case, the administrative record does not support the Forest Service decision. First, the FEIS fails to achieve its stated goal of implementing the GMP for the Grand Canyon National Park. For instance, the Forest Service claims that the GMP was of primary importance in its decision on managing Tusayan growth. The GMP outlined concerns regarding overcrowding in the Park, limiting transportation in the Park and, housing needs of Park Service employee. Commercial development was not raised as an issue in the GMP. Moreover, while the stated goal of the FEIS was to implement the GMP, under Alternative H CFV will neither finance the transportation center, nor provide housing stock for Park and concessionaire workers—two primary elements of the GMP.

Second, the Forest Service decided on Alternative H, in part, because there was a concern that, in the absence of a land exchange, future development of inholdings held by CFV could increase the management responsibilities for the Forest Service and Park Service. The record, however, fails to provide any information to substantiate this concern. There is nothing to indicate the immediate or future development of the inholdings, other than through this particular land exchange.

Additionally, the development proposed under Alternative H will likely attract more visitors to the Park, in direct contrast to the stated goals of the GMP. In fact, the Forest Service acknowledges that, "through these improvements, there is the potential to pull more visitors to the GCNP [Grand Canyon National Park]..." Indeed, under Alternative H, the FEIS clearly anticipates an aggressive marketing campaign to boost visitation.

Against this background, the Forest Service action was arbitrary and capricious and is not supported by the administrative record.

### 7. "Tiering"

 "Tiering" is "the coverage of general matters in broader environmental impact statements...with subsequent narrower statements or environmental analyses...incorporating by reference the general discussion and concentrating solely on the issues specific" to them. 40 C.F.R. § 1508.28. The Council on Environmental Quality's NEPA regulations encourage agencies to avoid duplicating paperwork and environmental analysis by tiering—by incorporating discussions of environmental effects from broad programmatic environmental impact statements into subsequent NEPA documents on specific actions within the scope of the programmatic statement. 40 C.F.R. § 1502.20

Sierra Club asserts in Count VII of the Amended Complaint that the Forest Service violated NEPA by improperly tiering the FEIS to the National Park Service's General Management Plan. The GMP identifies four management problems: increasing automobile traffic in the Park; substandard and overcrowded employee housing; insufficient community facilities; and overburdened, and sometimes inadequate, visitor services and facilities. Sierra Club acknowledges that the Forest Service is permitted to tier to other environmental impact statements but essentially takes issue with the Forest Service's reliance on the GMP. Sierra Club reasons that the GMP does not include any analysis of, or justification for, the inevitable environmental and economic impacts created by the increased hotel and retail space that would be required to subsidize the construction of such housing (and oth-

er infrastructure) on federal lands being transferred into private ownership, or how such a transfer would improve the Grand Canyon visitor experience.

CFV and the Forest Service contend that the Forest Service did not *improperly* tier the FEIS to the GMP when they evaluated the potential impacts of Alternative H and the other alternatives. The Forest Service acknowledges that it considered the land-use objectives in the GMP in evaluating which alternative best responded to the land-use problems in the area.

The Ninth Circuit only allows tiering to another environmental impact statement. *See Neighbors of Cuddy Mountain v. USFS,* 137 F.3d 1372, 1380 (9th Cir.1998). In accepting the Park Service GMP as an integral part of the Tusayan Growth EIS, the Forest Service accepted responsibility to assist the Park Service with the implementation of those portions of the GMP, including the "Sustainable Development Concept" identified in the GMP, that would occur on National Forest System lands.

The GMP, other than identifying future Park Service and concessionaire housing requirements, some community needs and, desired interpretive services, did not include any analysis of, or justification for the inevitable environmental and economic impacts created by the increased hotel and retail space that would be required. The FEIS and ROD were arbitrarily and capriciously tiered to the GMP.

### C. Federal Land Policy and Management Act

The Federal Land Policy and Management Act authorizes the exchange of public and private lands within the National Forest System. 43 U.S.C. § 1716(a).

A tract of public land or interests therein may be disposed of by exchange by the Secretary under this Act and a tract of land or interests therein within the National Forest System may be disposed of by exchange by the Secretary of Agriculture under applicable law where the Secretary concerned determines that the public interest will be well served by making that exchange: *Provided,* that when considering public interest the Secretary concerned shall give full consideration to better Federal Land Management and the needs of the State and local people, including needs for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve retained in Federal ownership are not more than the values of the non-Federal lands or interest and the public objectives they could serve if acquired.

43 U.S.C. § 1716.

As a threshold matter, the Court must address whether the FLPMA claim is ripe for review. Because ripeness is a jurisdictional matter, it may be raised *sua sponte* by the court. *See Southern Pacific Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 502 (9th Cir.1990). The Ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681, (1967). In suits seeking both declaratory and injunctive relief the ripeness requirement serves the same function in limiting declaratory relief as the imminent harm requirement serves in limiting injunctive relief. *See Hodgers–Durgin v. de la Vina,* 199 F.3d 1037, 1044 (9th Cir.1999).

Ripeness involves both a constitutional and prudential component. *See Thomas v. Anchorage Equal Rights*

*Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). The constitutional component requires that issues in a case or controversy be "definite and concrete, not hypothetical or abstract." *Id.* at 1139, citing, *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945). The prudential inquiry focuses on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 1141, citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); see also *Ohio Forestry Assoc., Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). This Court is concerned with both the constitutional and prudential aspects of ripeness with regard to the FLPMA claim.

■ The judicial power extends only to "cases" and "controversies." U.S. CONST. art. III § 2. "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing, ripeness, mootness, and the political question doctrine." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Existence of a case or controversy is a prerequisite to all federal actions, including those for declaratory and injunctive relief. *See Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454 (3rd Cir.1994). For the "case or controversy" requirement to be satisfied, the controversy must be such that it can presently be litigated and decided, and not hypothetical, conjectural, conditional, or *based on the possibility of a fact situation that may never develop. See Grinols v. Mabus*, 796 F.Supp. 972 (N.D.Miss.1992) (emphasis added).

■ The "injury in fact" element requires the plaintiff have suffered "an invasion of a legally protected interest" which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ A prudential ripeness inquiry requires the Court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of the withholding court considering action". *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *see also Hodgers–Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir.1999).

In this case, Sierra Club seeks declaratory and injunctive relief on the assertion that Alternative H is not in the best interest of the public, violating § 1716(a) of FLPMA.

The November 7, 2000, referendum of Coconino County denied the zoning necessary to fully implement the plans anticipated in Alternative H. Although the injuries that may result if Sierra Club can prove the contentions in the Amended Complaint appear to be "concrete or particularized," the November 2000 rejection of the referendum ensures that these potential injuries are far from being "actual or imminent." *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The Forest Service and CFV acknowledge that the voters denial of the referendum precludes the transfer of land titles and the recording of deeds.

Thus, the FLPMA claim lacks constitutional ripeness until the actual transfer of the land and/or deeds is actual or imminent. Furthermore, the transfer of land and deed may only become imminent when rezoning takes place. Assuming CFV applies for rezoning a second time, such an application may not be submitted until one year following the rejection of the November 2000 referendum. November 2001 is the earliest CFV could receive approval for rezoning, assuming CFV seeks approval.

The FLPMA claim is not ripe given the Coconino County voters denial of the November 2000 referendum. Consequently, the anticipated injury upon the transfer of land titles is not yet ripe, as there is no certainty as to when Sierra Club will suffer this injury, or if they will suffer any injury. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998).

With respect to prudential ripeness, it is apparent that the details of the land exchange are sufficiently concrete or particularized to assess the merits of the issue. This claim does not involve "abstract disagreements over administrative policies." *Abbott Labs.,* 387 U.S. at 148, 87 S.Ct. 1507. Nonetheless, evaluating a plan which faces formidable obstacles, would ultimately result in a waste of judicial resources at this juncture.

Thus, this Court declines to reach the merits of the FLPMA claim.

IT IS ORDERED that defendant's Motion to Dismiss (Doc. 90–1), or in the alternative Stay Action (Doc. 90–2) are DENIED.

IT IS FURTHER ORDERED that defendant's Motion to Strike (Doc. 52) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court shall strike (1) the affidavit of R. Dennis Lund (Tab 4 to Sierra Club's Statement of Facts); (2) excerpts from a June 22, 2000 General Office Accounting report (Tab 67 to Sierra Club's Statement of Facts); (3) a December 1, 2000, new article from the *Arizona Daily Sun* (Tab 63 to Sierra Club's Statement of Facts).

IT IS FURTHER ORDERED that Sierra Club's Cross–Motion to Strike (Doc. 62) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court shall strike (1) the declaration of Wayne Hyatt (submitted by CFV); (2) the affidavit of Tom Gillet; and (3) the May 24, 2000 newspaper article.

IT IS FURTHER ORDERED that Sierra Club's Motion for Summary Judgement (Doc. 48) is GRANTED as to Counts I through VII of the First Amended Complaint.

IT IS FURTHER ORDERED that the Forest Service's Motion for Summary Judgement (Doc. 40) and Intervenor CFV's Motion for Summary Judgement (Doc. 37) are DENIED as to Counts I through VII of Sierra Club's First Amended Complaint.

IT IS FURTHER ORDERED that Count VIII (FLPMA) of Sierra Club's First Amended Complaint is *sua sponte* DISMISSED as the claim is not yet ripe for this Court's review.

IT IS FURTHER ORDERED that because this disposes of all Counts in the First Amended Complaint, the matter may be DISMISSED from this Court's docket and the Clerk of Court is to enter judgment accordingly.