DAVIS MOUNTAINS TRANS–PECOS HERITAGE ASSOCIATION, et al., Plaintiffs,

v.

UNITED STATES AIR FORCE, et al., Defendants.

Civil Action No. 5:01–CV–289–C.

United States District Court, N.D. Texas, Lubbock Division.

March 24, 2003.

Susan B. Biggs, U.S. Attorney's Office, San Antonio, TX, John R. Parker, U.S. Attorney's Office, Dallas, TX, for Defendants.

Murray D. Feldman, B Newal Squyres, Holland & Hart, Boise, ID, Matt D. Matzner, William J. Wade, Crenshaw Dupree & Milam, Lubbock, TX, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER

CUMMINGS, District Judge.

On this date the Court considered Plaintiffs' (DMTPHA) Motion for Summary Judgment filed on October 17, 2002, by Davis Mountains Trans–Pecos Heritage Association, et al. ("Plaintiffs"). The United States Air Force, et al. ("Defendants") filed Defendants' Response to Plaintiffs' Motion for Summary Judgment on December 18, 2002. On January 17, 2003, Plaintiffs filed Plaintiffs' Reply in Support of Its Motion for Summary Judgment. After considering all the relevant arguments and evidence, the Court **DENIES** Plaintiffs' Motion for Summary Judgment.

On this date the Court concurrently considered Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment filed December 18, 2002. Plaintiffs' Response and Brief in Opposition to Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment was filed on January 17, 2003. Defendants filed no reply. After considering all the relevant arguments and evidence, the Court **GRANTS** Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment.

On this date the Court concurrently considered Plaintiffs' Motion and Brief in Support of Motion to Strike Defendants' Post Hoc Declarations of Bowles, Cormier, Skujins, and Fidell filed January 17, 2003. Defendants filed no response. After considering all the relevant arguments and evidence, the Court **GRANTS** Plaintiffs' Motion to Strike Defendants' Post Hoc Declarations of Bowles, Cormier, Skujins, and Fidell.

On this date the Court concurrently considered Defendants' Cross–Motion for Summary Judgment filed December 18, 2002. Plaintiffs' Response to Defendants' Cross Motion for Summary Judgment was untimely filed on January 17, 2003. Defendants filed no reply. After considering all the relevant arguments and evidence, the Court **GRANTS** Defendants' Cross–Motion for Summary Judgment.

## I.

## FACTUAL BACKGROUND

### A. Parties

Plaintiff Davis Mountains Trans–Pecos Heritage Association (individually "DMTPHA") is a non-profit association incorporated in Texas and is a regional chapter of the Trans Texas Heritage Association. DMTPHA's principal office is located in Alpine, Brewster County, Texas. The members of DMTPHA represent over 13 million acres of privately owned land in the region.

DMTPHA properties include land located in Brewster, Culberson, Hudspeth, Jeff Davis, Pecos, Presidio, and Reeves Counties. These properties are used for ranching, agriculture, personal residences, tourism and hunting operations, commercial cattle operations, and various modes of recreational enjoyment of the land. The properties also include structures of his-

toric significance and represent several generations of family holdings.

Dale and Susan Toone; Tim and Rexann Leary; Earl and Sylvia Baker; Mark and Ann Daugherty; Dick R. Holland; J.P. Bryan; Jackson B. "Ben" Love, Jr.; and Kaare J. Remme (collectively "Individual Plaintiffs") are landowners or business operators situated in Brewster, Hudspeth, Pecos, and Reeves Counties in far west Texas. Individual Plaintiffs collectively own and control vast acres of land which are used for, *inter alia,* ranching, quail hunting, farming, and eco-tourism. In addition, two of the Individual Plaintiffs operate small private aircraft utilizing private takeoff and landing strips on their respective properties to conduct unscheduled overflights of their land.

DMTPHA representatives and Individual Plaintiffs participated in the review process of proposals for the Final Environmental Impact Statement ("FEIS"). DMTPHA and Individual Plaintiffs submitted oral and written comments as part of this review process.

Defendants include the United States Air Force, the United States Department of Defense, the United States Secretary of the Department of Defense, and various individual United States military personnel sued in their official capacities.

## B. Final Environmental Impact Statement

In January 2000 Defendants made public the FEIS which had been prepared to assist Defendants in determining whether to implement the Realistic Bomber Training Initiative ("RBTI"). Of the four alternatives evaluated by the FEIS to fulfill the purpose of the RBTI, Defendants elected to implement Alternative B. The RBTI's purpose is to establish a set of linked training assets (1) to permit aircrews from Barksdale Air Force Base ("AFB") and Dyess AFB to train for various missions while maximizing combat training time; (2) to provide linkage of airspace and other assets that support realistic training of bomber aircrews; and (3) to ensure flexibility and variability in the training of support bomber combat missions.

The four RBTI alternatives consisted of

**Alternative A** No Action;

**Alternative B** Instrument Route (IR)–178/Lancer Military Operations Area (MOA), 85 percent existing airspace;

**Alternative C** IR–178/Texon MOA, 80 percent existing airspace;

**Alternative D** IR–153/Mt. Dora MOA, 90 percent existing airspace.

Under Alternative A, Defendants' bombers would continue to use existing airspace and existing Electronic Scoring Sites ("ESS") at current levels. Alternatives B, C, and D each involve (1) changes in the structure and use of the airspace, including some additional airspace and some eliminated airspace; (2) decommissioning the ESS at both Harrison, Arkansas, and La Junta, Colorado; and (3) construction of ten new electronic threat emitter sites and two ESS. Alternatives B and C lie almost wholly in western Texas, while Alternative D is located in northeastern New Mexico.

Defendants admit that aircraft noise levels would increase 2–13 decibels ("dB") in Alternatives B and C airspace and 1–18 dB in Alternative D airspace. The percentage of "highly annoyed" persons could rise under Alternative B, IR–178, by eight percent, and Defendants concede that increases in noise levels from RBTI aircraft could be perceived by some as affecting their quality of life.

Defendants also acknowledge that Alternatives B and C would necessitate overflights of two special use land management areas (*e.g.,* state parks, scenic rivers) but

point out that Alternative D would necessitate overflights of thirteen such areas. Both Alternatives B and C would cause a potential disturbance of the *aplomado* [lead-colored] falcon historic range where eleven sightings of *aplomado* falcons have occurred since 1992, but Mexican spotted owls and bald eagles, both federally listed as threatened or endangered species, are found within Alternative D's airspace.

Defendants admit that the current minimum altitude for segment BC of IR–178 is 400 feet above ground level ("AGL") and the current minimum altitude for segment AB of IR–178 is 1,000 feet AGL. Defendants admit that the current minimum altitude for segment JK of IR–178 is 200 feet AGL but specifically note that the minimum altitude for segment JK of IR–178 under Alternative B will be raised to 300 feet AGL. Defendants also acknowledge that the minimum altitude for segment IJ of IR–178 under Alternative B will be 300 feet AGL.

### C. Record of Decision

After considering the FEIS and the environmental consequences involved with each of the above alternatives, together with public comments and agency input, Defendants signed the Record of Decision ("ROD") for the RBTI on March 24, 2000, and elected to implement Alternative B. Defendants assert that they selected Alternative B because the proposed RBTI operational and training assets located within approximately 600 nautical miles of Alternative B's Barksdale and Dyess AFBs would include the following:

1. A Military Training Route ("MTR") that
 (a) offers variable terrain for use in terrain-following and terrain-avoidance training flights;
 (b) overlies lands capable of supporting electronic threat emitters and

ESS that permit flights down to 200 feet AGL; and
 (c) links to a MOA.

2. A MOA measuring at least 40x80 nautical miles with a floor of 3,000 feet AGL and extending to 18,000 feet above mean sea level ("MSL") used for avoiding simulated threats and simulated attacks.

3. An Air Traffic Control Assigned Area ("ATCAA") above the MOA at 18,000 to 40,000 feet MSL to be used for high-altitude training.

4. Availability of, through lease or purchase, a set of five locations (15 acres each) under or near the MTR corridor, and an additional five locations (15 acres each) under or near the MOA, for placing electronic threat emitters that would simulate the variety of realistic threats expected in combat.

5. Two ESS which would be co-located with operations and maintenance centers, one under or near the MTR corridor and the other en route from the AFBs to the MTR and MOA, each to be constructed on leased, purchased, or Air Force-owned property.

Defendants' ROD also confirmed the decommissioning of two existing ESS located in Harrison, Arkansas, and La Junta, Colorado. Defendants contend that these existing sites do not provide the required operational training assets outlined in 1–3 above.

Defendants have also presented mitigation measures designed to reduce the potential for adverse effects to citizens and resources, including, but not limited to

1. reevaluating the potential impact of the RBTI on the *aplomado* falcon habitat;

2. considering construction alternatives in connection with roads, telephone lines, and power lines;

3. restructuring the MOA to measure at least 40x80 nautical miles with a floor of 6,200 feet MSL (raised from the originally established floor of 3,000 feet AGL) and extending to 18,000 feet MSL;

4. raising the floor of segment RS (new AB–AC) of IR–178 from the current 200 feet AGL to 800 feet AGL; raising the floor of segment ST (new AA–AB) of IR–178 from the current 200 feet AGL to 1,200 feet AGL; and raising the floor of IR–178 reentry routes to 6,200 feet MSL;

5. relocating ESS and electronic threat emitter sites to avoid historical sites, homes, large structures, and obvious bodies of water; and

6. limiting the annual sortie operations to pre-RBTI levels of 1,560/year (about 6/day).

## D. Plaintiffs' Claims for Relief[1]

**Second:** Violation of the National Environmental Protection Act ("NEPA"), Failure to Adequately Consider Environmental Impacts

Plaintiffs argue that Defendants have failed to adequately consider and evaluate the environmental impacts the proposed RBTI would have on, *inter alia*, noise levels, human safety and health, livestock, air quality, wildlife and birds, private property takings or property devaluation, local custom and culture of affected communities, access to and safety of the operations of regional charted and uncharted airfields, and ranching, commercial, and recreational activities.

**Third:** Violation of NEPA, Failure to Consider Appropriate No Action Alternative

Plaintiffs argue that Defendants failed to adequately consider an appropriate No Action alternative and failed to accurately describe current overflight routes, authorizations, and environmental effects for the Trans–Pecos region and surrounding regions.

**Fourth:** Violation of NEPA, Failure to Prepare Adequate Environmental Documentation for IR–178 Activities

Plaintiffs argue that Defendants' current and ongoing operations within IR–178 are not supported by the requisite environmental documentation necessary under NEPA. Plaintiffs allege that Defendants' IR–178 documentation is outdated, does not reflect current conditions or impacts, has not been supplemented as required by law, and otherwise does not comply with NEPA requirements.

**Fifth:** Violation of NEPA, Failure to Adequately Respond to Public Comments

Plaintiffs complain that Defendants did not adequately or meaningfully respond to numerous public comments received by Defendants and that Defendants failed to identify and incorporate opposing views into the decisionmaking process.

**Sixth:** Violation of NEPA, Inadequate Discussion of Mitigation Measures

In violation of NEPA's "reasonably complete" standard, Plaintiffs contend that Defendants have failed to adequately address mitigation measures with respect to airspace and aircraft operations, land management and land use, wildlife, and cultural and recreational resources.

---

1. Plaintiffs' · First Claim for Relief was dismissed by Order of this Court on February 12, 2002.

**Seventh:** Violation of NEPA, Failure to Adequately Consider Cumulative Impacts

Plaintiffs complain that Defendants did not consider all cumulative impacts potentially resulting from the effects of the RBTI when added to other past, present, and reasonably foreseeable actions affecting Plaintiffs. Plaintiffs also complain that Defendants have failed to identify or to adequately discuss the impact of past activities in the region so that the aggregate cumulative effect of past, present, and reasonably foreseeable actions may be identified.

**Eighth:** Violation of NEPA, Improper Scope of Environmental Document

Plaintiffs complain that Defendants did not adequately analyze the environmental effects of the entire scope of the RBTI in the region, including the recent expansion of the German Luftwaffe operations out of Holloman Air Force Base *vis-à-vis* the proposed modification and expansion of the RBTI. Rather, Plaintiffs contend that Defendants prepared a separate environmental assessment ("EA") and a separate environmental impact statement ("EIS") for each project but failed to consider interrelated, connected, cumulative, or similar actions within the region in a single comprehensive NEPA document.

**Ninth:** Violation of NEPA, Failure to Consider Reasonable Range of Alternatives

Plaintiffs contend that Defendants failed to consider a reasonable range of alternatives, including (1) basing U.S. and/or foreign military aircraft at training locations other than Dyess and Barksdale AFBs; (2) utilizing alternative methods for meeting Defendants' training needs; or (3) utilizing off-shore training routes in the Gulf of Mexico.

**Tenth:** Violation of NEPA and the Noise Control Act ("NCA"), Failure to Address and Implement NCA Policies

Plaintiffs allege that Defendants have failed to adequately address the noise impacts of the proposed action in the affected areas, to discuss or address conflicts with federal, state, and local noise requirements, or to adequately mitigate the noise impacts of the proposed RBTI by limiting, reducing, or modifying the RBTI.[2]

**Eleventh:** Violation of NEPA, Commitment of Resources Prior to Final Agency Action

Plaintiffs complain that Defendants undertook actions committing Defendants' resources prior to making a decision based on the FEIS. Plaintiffs complain that Defendants' premature actions prejudiced the selection of alternatives and failed to use the FEIS as a basis for the decisionmaking process.

### E. Plaintiffs' Prayers for Relief

#### Judicial Review/Declaratory Judgment/Remand

Plaintiffs seek judicial review and ask this Court to declare (1) Defendants' FEIS and ROD arbitrary, capricious, and not in accordance with the law; (2) Defendants' activities on IR–178 to be in violation of NEPA; and (3) Defendants' implementation of the RBTI to be in violation of the NCA. Plaintiffs ask this Court to remand this matter to Defendants for preparation of NEPA documentation which adequately describes and assesses the complete scope of the effects of the RBTI and which demonstrates complete compliance with the NCA.

---

2. In Plaintiffs' Motion for Summary Judgment, Plaintiffs purport to stipulate to dismissal of Plaintiffs' Tenth Claim for Relief. However, arguments urged by Plaintiffs *infra* appear inconsistent with such a stipulation.

### Injunctive Relief/Mandamus

Plaintiffs ask this Court to enjoin (1) all military training activities authorized by the FEIS and/or ROD, as well as those currently conducted on IR–178, pending completion of and circulation of documentation complying with NEPA; (2) Defendants' decision to implement the RBTI unless an FEIS is prepared which addresses the full scope of Defendants' proposals, including interrelated, connected, cumulative, or similar actions; (3) Defendants' decision to submit an application to the Federal Aviation Administration ("FAA") for modification of MTR IR–178 and establishment of the Lancer MOA within New Mexico and west Texas; (4) Defendants' activities that are in violation of the NCA; and (5) Defendants' proposed military training operations from taking place in MTR IR–178 and the Lancer MOA to the extent those operations violate the Third Amendment to the United States Constitution.

Plaintiffs also ask this Court for issuance of a Writ of Mandamus directing Defendants to comply with the requirements set forth under NEPA and the NCA.

### Litigation Costs

Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, Plaintiffs ask this Court to award to Plaintiffs all costs of litigation, including expert witness fees and attorneys' fees.

### F. Defendants' Affirmative Answers

Defendants affirmatively answer that (1) this Court lacks jurisdiction over all or part of the subject matter of this action; (2) Plaintiffs lack standing to bring all or part of this action; (3) Plaintiffs have not exhausted the administrative remedies available to gain the relief sought in all or part of this action; (4) all or part of Plaintiffs' First Amended Complaint fails to state a claim upon which relief can be granted; (5) the issues in Plaintiffs' First Amended Complaint are not ripe for consideration by this or any other court; (6) all or part of Plaintiffs' First Amended Complaint is barred by the statute of limitations; and (7) all or part of Plaintiffs' First Amended Complaint is barred by the defense of laches.

## II.

## PROCEDURAL BACKGROUND

### Pleadings

Plaintiffs' Complaint was originally filed in the United States District Court for the Western District of Texas, Pecos Division, on March 29, 2001. Defendants' Original Answer to Plaintiffs' Complaint was filed June 7, 2001. An Order Transferring Action from the United States District Court for the Western District of Texas, Pecos Division, to this Court was filed October 22, 2001. Plaintiffs' First Amended Complaint was filed November 30, 2001, and Defendants' Answer to Plaintiffs' First Amended Complaint was filed November 30, 2001.

### Motion to Dismiss

Defendants' Motion to Dismiss Complaint in Part and Brief in Support Thereof was filed November 30, 2001, and Plaintiffs' (DMTPHA) Brief in Opposition to Defendants' Motion to Dismiss Complaint in Part was filed January 4, 2002. Defendants' Reply to Plaintiffs' Response to Motion to Dismiss Complaint in Part was filed January 17, 2002. On February 12, 2002, this Court granted in part Defendants' Motion to Dismiss Complaint in Part and dismissed Plaintiffs' First Claim for Relief but left undisturbed Plaintiffs' remaining claims for relief.

### Administrative Record

On November 16, 2001, this Court entered an Agreed Order that the final administrative record ("AR") which was filed with this Court in the matter of *Welch v. United States Air Force*, Civil Action No. 5:00–CV–392–C, on June 29, 2001, and comprised of eighteen (18) volumes, 12,904 pages, together with any supplementation as allowed by the Court, shall also serve as the AR in the instant case. The Agreed Order also allowed Defendants to supplement the AR with Exhibits A through Q.

Also filed November 16, 2001, was Plaintiffs' (DMTPHA) Motion and Brief in Support of Motion to Supplement and to Compel Filing of the Complete Administrative Record. Defendants' Opposition to Plaintiffs' Motion to Supplement was filed on December 18, 2001. This Court's Order granting in part and denying in part Plaintiffs' (DMTPHA) Motion to Supplement and to Compel Filing of the Complete Administrative Record was filed April 1, 2002.

Defendants' Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof was filed July 19, 2002. Plaintiffs' (DMTPHA) Response and Objections to Defendants' "Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof" was filed August 8, 2002. Defendants' Reply to Plaintiffs' (DMTPHA) Response to Notice of Filing Supplemental Materials to Administrative Record and Brief in Support Thereof was filed August 23, 2002. This Court's Order overruling Plaintiffs' Objections to Defendants' "Notice of Filing Supplemental Materials to Administrative Record" was filed September 11, 2002. Ultimately, the AR and supplements before this Court consisted of twenty-three (23) volumes, 15,950 pages.

### Summary Judgment

Plaintiffs' (DMTPHA) Motion for Summary Judgment was filed October 17, 2002, and Defendants' Response to Plaintiffs' Motion for Summary Judgment was filed December 18, 2002. On January 17, 2003, Plaintiffs filed Plaintiffs' Reply in Support of Its Motion for Summary Judgment.

Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment was filed December 18, 2002. Plaintiffs' Response and Brief in Opposition to Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment was filed January 17, 2003. Defendants filed no reply.

Plaintiffs' Motion and Brief in Support of Motion to Strike Defendants' Post Hoc Declarations of Bowles, Cormier, Skujins, and Fidell was filed January 17, 2003. Defendants filed no response.

Defendants' Cross–Motion for Summary Judgment was filed December 18, 2002. Plaintiffs' Response to Defendants' Cross Motion for Summary Judgment was untimely filed January 17, 2003. Defendants filed no reply.

### Oral Arguments

This Court's Order Setting Hearing to entertain oral arguments on January 29, 2003, specifically limited to (1) the appropriate baseline and (2) alternate basing, was filed January 2, 2003.

### III.

### STANDARD

Ordinarily, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact." FED.R.CIV.P. 56(c).

However, when reviewing the decision of an administrative agency, "a motion for summary judgment 'stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review.'" *Tex. Comm. on Natural Res. v. Van Winkle*, 197 F.Supp.2d 586, 595 (N.D.Tex.2002) (quoting *Piedmont Envtl. Council v. United States DOT*, 159 F.Supp.2d 260, 268 (W.D.Va.2001), *aff'd in relevant part by* 58 Fed.Appx. 20 (4th Cir.2003) (per curiam)).

"Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record ..., even though the Court does not employ the standard of review set forth in Rule 56, Fed.R.Civ.P." *Id.* (quoting *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C.1995)). In reviewing administrative agency decisions, the district court must determine whether, as a matter of law, evidence in the AR permitted the agency to make the decision it did, and "summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did." *Id.* (quoting *Sierra Club v. Dombeck*, 161 F.Supp.2d 1052, 1064 (D.Ariz.2001)). "Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more." *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 (5th Cir.1996) (citations omitted).

The standard for summary judgment on judicial review of agency decisions is not whether there is a genuine issue of material fact but "whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Envt. Now! v.*

*Espy,* 877 F.Supp. 1397, 1421 (E.D.Cal. 1994) (citing *Good Samaritan Hosp., Corvallis v. Mathews,* 609 F.2d 949, 951 (9th Cir.1979)). Thus, the issue is not whether material facts are disputed but whether the agency properly dealt with the facts. *Lodge Tower Condo. Ass'n v. Lodge Props., Inc.,* 880 F.Supp. 1370, 1376–77 (D.Colo.1995). The "court must find that the evidence before the agency provided a rational and ample basis for its decision." *Id.* at 1377 (quoting *Northwest Motorcycle Ass'n v. United States Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir.1994)).

The narrow scope of the court's review is to determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment," not to weigh the evidence pro and con. *Delta Found., Inc. v. United States,* 303 F.3d 551, 563 (5th Cir.2002) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." *Id.* (quoting *Harris v. United States,* 19 F.3d 1090, 1096 (5th Cir.1994)). The "agency's decision need not be ideal, so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Id.* (quoting *Harris,* 19 F.3d at 1096).

## IV.

### DISCUSSION

Plaintiffs argue that they are entitled to summary judgment because Defendants' FEIS and ROD are in violation of NEPA and the enforcement regulations promulgated by the Council on Environmental Quality ("CEQ"), as well as Defendants' own regulations. Plaintiffs complain that

the AR before the Court does not support the decisionmaker's choice of Alternative B, MTR IR–178, or the RBTI as a whole, and Plaintiffs seek judicial review of the final decision to approve the modification and expansion of the existing MTRs and the Lancer MOA.

Defendants respond by arguing that Plaintiffs have failed to identify any major federal action involving IR–178 that would significantly affect the environment adversely and that Plaintiffs have failed to meet their burden of establishing that approval of the RBTI was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

### *Judicial Review*

NEPA was enacted to establish a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a[CEQ]." 42 U.S.C. § 4321, *et seq.* (1994).[3] In order to achieve these substantive goals, NEPA requires compliance with certain procedures before and during the undertaking of any project that affects the environment. *See* NEPA § 4332. *See also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (explaining that NEPA's goals are achieved through "action-forcing" procedures which do not mandate particular results, but "simply prescribe[ ] the necessary process"). Thus, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835.

Under NEPA, adequate identification and evaluation of the adverse environmental effects of the proposed action require an agency to take a hard look at the environmental consequences of its actions, which includes a detailed EIS on

 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

 (iii) alternatives to the proposed action,

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

NEPA § 4332(2)(C). *See also* 40 C.F.R. § 1500, *et seq.* (2002) (setting forth the CEQ regulations expanding upon the appropriate form and content of an EIS).

An EIS is intended to provide decisionmakers "with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process." *Northwest Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1060, 1064 (9th Cir.1995). The EIS "insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug and serves as an environmental full disclosure so that the public can weigh a project's benefits against its environmental costs." *Nat'l Audubon Soc'y v. Hoffman,* 132 F.3d 7, 12 (2d Cir.1997) (quoting *Sier-*

---

**3.** Hereinafter cited as "NEPA § ..."

*ra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1049 (2d Cir.1985)) (internal quotations omitted).

■ However, because NEPA does not contain provisions to determine whether agency action complies with NEPA's necessary processes, compliance with NEPA is reviewed under the APA, 5 U.S.C. § 500, *et seq.* (1996).[4] *See Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988) (concluding that "NEPA itself authorizes no private right of action, ... [b]ut the APA provides for judicial review of agency action" under § 702 of the APA). Judicial review of agency action under the APA requires a "thorough, probing, in-depth review" of the AR to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *ITT Fed. Servs. Corp. v. United States,* 45 Fed. Cl. 174, 184 (Fed.Cl.1999).

The APA provides the following scope of judicial review:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

APA § 706.

Because NEPA "exists to ensure a process, not a result," *Mississippi River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir.2000) (quoting *Morongo Band of Mission Indians v. FAA,* 161 F.3d 569, 575 (9th Cir.1998)), "the variability of this procedural requirement has produced grossly general and conflicting judicial pronouncements." *Trans–Am. Van Serv., Inc. v. United States,* 421 F.Supp. 308, 318 (N.D.Tex.1976). Consequently, a number of courts began to expand the definition of the "whole record" before the court, but at the same time candidly recognized the narrow scope of review. *Pub. Power Council v. Johnson,* 674 F.2d 791, 793 (9th Cir.1982). *See also County of Suffolk v. Sec'y of Interior,* 562 F.2d 1368, 1384 (2d Cir.1977) (acknowledging the rule of limited record review, then recognizing that the focus of judicial inquiry is not necessarily restricted to the administrative record). Indeed, the United States Supreme Court has long held that expansion

---

4. Hereinafter cited as "APA § ..."

of the AR is appropriate when the record submitted fails to explain the basis for the agency's action, thereby frustrating judicial review. *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

■ Thus, the AR may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." *Arkla Exploration Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir.1984). "The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included." *Sierra Club v. Marsh*, 976 F.2d 763, 772–73 (1st Cir.1992).

When adverse impacts are set forth in great detail in extra-record written submissions, "the court properly can consider this record in determining whether there exists a rational basis for the [agency] decision." *Exxon Corp. v. Fed. Energy Admin.*, 398 F.Supp. 865, 874 (D.D.C. 1975). *But cf. Smith v. FTC*, 403 F.Supp. 1000, 1008 (D.C.Del.1975) (holding that, because the scope of review of agency matters is confined to the administrative record, discovery in the form of depositions from agency officials was improper and irrelevant).

■ A court may also elect to allow extra-record evidence to determine whether an agency's final action meets the test of rationality under the following circumstances:

1. when agency action is not adequately explained in the record before the court;

2. when the agency failed to consider factors which are relevant to its final decision;

3. when an agency considered evidence which it failed to include in the record;

4. when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

5. in cases where evidence arising after the agency action shows whether the decision was correct or not;

6. in cases where agencies are sued for a failure to take action;

7. in cases arising under NEPA; and

8. in cases where relief is at issue, especially at the preliminary injunction stage.

*ITT Fed. Servs. Corp.*, 45 Fed. Cl. at 185. Thus, an adequate record can sometimes only be determined "by looking outside the [AR] to see what the agency may have ignored." *County of Suffolk*, 562 F.2d at 1384.

■ It is well established that "[t]he burden of proving that an agency decision was arbitrary or capricious generally rests with the party seeking to overturn the agency decision." *Van Winkle*, 197 F.Supp.2d at 596 (citing *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995) and *N.C. Alliance for Transp. Reform v. United States DOT*, 151 F.Supp.2d 661, 679 (M.D.N.C.2001)). *See also Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir.1975) (holding that plaintiffs bear the burden of showing by a preponderance of the evidence that defendants have failed to adhere to the requirements of NEPA).

■ In determining whether an agency's action was arbitrary or capricious, the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judg[ ]ment." *Dombeck*, 161 F.Supp.2d at 1064 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The agency must examine the relevant data and articulate a satisfactory explana-

tion for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). However, "the Court is not allowed to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■■■ It is also well established that a court may not set aside an agency's action based on the exercise of the agency's accumulated expertise merely because the court might reach a different result. *Simeon Mgmt. Corp. v. FTC,* 579 F.2d 1137, 1142 (9th Cir.1978). If the analysis of the relevant documents "requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies." *Or. Natural Res. Council,* 490 U.S. at 377, 109 S.Ct. 1851 (internal quotations omitted). Moreover, the Supreme Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

The Supreme Court has cited the following nonexclusive examples of circumstances which would normally be considered arbitrary and capricious: (1) the agency relied on factors which Congress had not intended the agency to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency offered an explanation for its decision that ran counter to the evidence before the agency; or (4) the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856.

When reviewing challenges brought under APA § 706 regarding an agency's compliance with NEPA, the Fifth Circuit set forth the following three criteria for determining the adequacy of an EIS:

(1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives;

(2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

(3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Miss. River Basin Alliance,* 230 F.3d at 174.

Information satisfying these criteria must be in the EIS and the conclusions upon which the EIS is based must be supported by evidence contained in the AR. *Id.* at 174–75. "[T]he judicial concern is whether the [EIS] is a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA[ ] and that the court should not second-guess the experts." *Manygoats v. Kleppe,* 558 F.2d 556, 560 (10th Cir.1977). A court "should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *ITT Fed. Servs. Corp.,* 45 Fed. Cl. at 184.

### A. Hard Look

■■■ Plaintiffs argue that Defendants failed to make available to the decisionmaker detailed information concerning significant adverse environmental effects in connection with livestock, wildlife, wake vortices, socioeconomics, and airspace use and management. Without such information, Plaintiffs complain that informed pub-

lic participation and rational decisionmaking were not possible.

Plaintiffs specifically complain that a sufficiently detailed analysis of the RBTI's adverse effects on livestock and poultry operations was not conducted. Plaintiffs insist that a county-level analysis should have been undertaken by Defendants to consider the potential adverse impacts on livestock and poultry production and reproduction. Plaintiffs also contend that Defendants have failed to adequately consider the potential health and safety problems involving horses and ranch workers living within the RBTI area.

In addition, Plaintiffs accuse Defendants of summarily discounting the adverse impacts of the RBTI's noise levels on the wildlife inhabiting the RBTI area. Plaintiffs complain that Defendants' reliance on day/night averaging of noise impacts over a twenty-four-hour period ("Ldn") minimizes the true level and frequency of the individual noise events and, thus, fails to legitimately evaluate the adverse noise effects of the RBTI on the underlying wildlife.

Plaintiffs next complain that Defendants failed to seriously consider the adverse impacts of the wake vortex caused by each low-level overflight of the RBTI. Contrary to Defendants' assertions that "military overflights at 630 miles per hour only 300 feet [AGL] would cause no more than a gentle breeze at the surface," Plaintiffs claim that windmills, fences, other ranch structures, livestock, and persons have suffered real and severe impacts from the wake turbulence and jet blasts from low-flying aircraft. In any event, Plaintiffs argue that Defendants' eight-page analysis of the effects of wake vortices was based on an inappropriate methodology not applicable to B–1 bombers and, thus, was inadequate.

Plaintiffs also argue that Defendants have failed to accurately disclose the socioeconomic and technical costs associated with the RBTI. Plaintiffs complain that although Defendants chose to "trumpet the benefits" of the RBTI, Defendants have not fully disclosed, even on an informal basis, an analysis of the RBTI's costs. By failing to do so, Plaintiffs argue that Defendants deprived the public and the decisionmaker of essential information integral to NEPA's decisionmaking process.

As to the potential impact on Plaintiffs' property values, Plaintiffs argue that the RBTI's overflights will adversely affect the leasehold values for hunting, hiking, bird watching, camping, eco-tourism, and other recreational activities on Plaintiffs' properties. As a consequence, Plaintiffs assert that Defendants' RBTI will adversely impact the income stream or consumptive use of the underlying properties owned by Plaintiffs. Plaintiffs further complain that the RBTI's excessive noise events will negatively implicate the marketability of Plaintiffs' underlying properties. Indeed, Plaintiffs note that Defendants acknowledge in the AR that "increased aircraft noise does appear to lower property values."

Finally, Plaintiffs charge that Defendants failed to take a hard look at the concomitant aeronautical and airspace management impacts of Alternative B's Lancer MOA. Specifically, Plaintiffs contend that Defendants did not incorporate into the FEIS the FAA's July 28, 2000, "Combined Aeronautical Study," which identified, *inter alia*, the economic impacts on airports, carriers, fixed base operators, and other civil aviation activities. Plaintiffs complain that Defendants did not consider (1) that many fixed base operators and transient services providers might be forced to other locations because of the airspace complexity resulting from the

RBTI; (2) that the Lancer MOA could adversely impact the costs for commercial air carriers operating out of Lubbock International Airport; and (3) that the Lancer MOA could negatively impact the regional economy of the City of Lubbock, Texas. Instead, Plaintiffs contend that Defendants' FEIS merely notes that under Alternative B the "FAA would need to ensure conflicts between proposed ATCAA and intersecting jet routes are avoided."

Plaintiffs also claim that Defendants failed to make available to the RBTI decisionmaker, or the public, an FAA cumulative impact assessment which determined that the RBTI's creation of the Lancer MOA would have a significant impact on instrument flight rules ("IFR") operations and would limit the availability of direct routes and altitudes that are currently in use. Plaintiffs argue that Defendants could not have adequately considered appropriate mitigation measures absent the FAA's critical information on airspace management and the RBTI's impacts on civil and commercial aviation.

Contrary to Plaintiffs' many assertions, Defendants first respond that the FEIS contains dozens of studies analyzing the potential effects of the RBTI on livestock. Although Defendants acknowledge that the studies included in the AR sometimes reach contradictory conclusions and that injuries to livestock are possible, Defendants argue that the great weight of the studies nevertheless indicates that livestock adapt and habituate to aircraft overflights and that few, if any, negative impacts on livestock production, growth, or reproduction occur.

Defendants also point to the numerous studies included in the FEIS which specifically discuss the effects of overflights on various species of wildlife and the great detail and expansive review Defendants devoted to the potential for adverse effects. Although Defendants again acknowledge that the parties' experts at times expressed conflicting views, Defendants argue that they were entitled to rely on the reasonable opinions of their own qualified experts.

With regard to the possible harmful effects of the RBTI's B–1 and B–52 wake vortices, Defendants contend that the FEIS provides a complete narrative description of wing vortex and its effects and, hence, adequately explains why wake vortex is not an issue in the instant matter. Defendants argue that the conclusion stated in the AR that a B–52 flying at 300 feet AGL would generate a surface wind speed of four miles per hour was based on the results of extensive actual test flights performed with B–52s. Based on the FEIS's illustrative documentation generally depicting the track and lifespan of a typical wake vortex consistent with the B–52 tests conducted, Defendants argue that a B–1 would also be expected to produce similar low wind speeds at ground level. Moreover, Defendants note that they have engaged in low-level flight operations for more than fifty years without wake vortex damage to structures becoming a significant issue and, because the RBTI raises the floor of IR–178 from 200 feet AGL to 300 feet AGL, the likelihood that adverse effects would now result from any wing turbulence is further decreased.

Defendants also dispute Plaintiffs' contention that the non-speculative socioeconomic impacts reasonably foreseeable and related to the RBTI were not adequately identified and discussed. Rather, Defendants argue that the AR reflects that the socioeconomic merits and drawbacks of the various RBTI alternatives were fully considered by Defendants. Further, Defendants contend that not only is a formal cost/benefit analysis not required by NEPA, but a cost/benefit analysis was nev-

er contemplated by Defendants, because neither the operational considerations nor the environmental consequences of the RBTI lent themselves to the assignment of specific socioeconomic values. Instead, Defendants argue that identifying the merits and drawbacks so as to allow meaningful consideration by the public and the decisionmaker fully discharged Defendants' duty under NEPA.

As to Plaintiffs' claim that the RBTI could adversely affect property values, Defendants claim that the studies of land values and noise in the vicinity of civil airports, as cited by Plaintiffs, as well as the studies of properties surrounding military installations included in the AR, are inapposite to the arguments made regarding the effects of aircraft noise on property values beneath MTRs and/or MOAs. Rather, Defendants argue that Plaintiffs have offered no demonstrable relationship between the RBTI's proposed operations (approximately six flights/day over a large land area, many of which are at higher MOA altitudes) and any alleged decrease in Plaintiffs' land values. Defendants maintain that the decision to limit discussion about the speculative and uncertain effects of jet noise on property values is consistent with NEPA's requirements.

With regard to Plaintiffs' assertions that the RBTI's AR and supplementing materials failed to address mitigation measures relevant to the concerns expressed in the FAA's formal aeronautical study issued post-ROD, Defendants charge Plaintiffs with misapprehending the distinctions between (1) Defendants' role in fulfilling NEPA's obligations and (2) the FAA's role, as a cooperating agency, in commenting on issues within its area of special expertise for the purpose of making an independent decision regarding relevant airspace modifications.

In like manner, Defendants argue that Plaintiffs have misunderstood the timing requirements set forth by the CEQ regulations, which provide that Defendants cannot make a decision until ninety days after publication of the notice of the draft EIS ("DEIS") or until thirty days after publication of the notice of the FEIS. Here, Defendants note that the notice for the DEIS was published on March 30, 1999, and that the notice for the FEIS was published on February 1, 2000. Because the ROD was signed in April, 2000, Defendants argue that the timing requirements under NEPA were fully satisfied; and because the FAA's independent Formal Aeronautical Study was not issued until July 28, 2000, the study could not have been a part of the RBTI AR before the decisionmaker. Therefore, contrary to Plaintiffs' assertions, Defendants argue that the FEIS clearly addressed the potential impacts of Alternative B on airspace management, as well as mitigation measures to be taken in response to those impacts found to exist. For each of the reasons expressed above, Defendants assert that information in sufficient detail was placed before the public and the decisionmaker for a reasoned choice of alternatives; thus, Plaintiffs' arguments must fail.

### Judicial Determination

The Court begins by noting that when NEPA was enacted, Congress did not require agencies to elevate environmental concerns over other appropriate considerations; rather, Congress required only that the agency take a hard look at the environmental consequences before taking a major action. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

This Court is, of course, mindful of the statutory requirement that the FEIS be a "detailed statement." NEPA

§ 4332(2)(C). "However, the Court must also avoid placing extreme or unrealistic burdens on the compiling agency." *Isle of Hope Historical Ass'n, Inc. v. United States Army Corps of Eng'rs*, 646 F.2d 215, 220 (5th Cir. Unit B 1981) (citing *Morton*, 510 F.2d at 819). An EIS "must be concise, clear, and to the point and written in plain language so that the public can easily understand it." *Van Winkle*, 197 F.Supp.2d at 600 (citing *Marita*, 46 F.3d at 619).

Compliance is to be judged against a "rule of reason." *Id.* "[I]t is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action." *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of United States Army*, 492 F.2d 1123, 1136 (5th Cir.1974). In short, this Court must follow a pragmatic standard which requires good faith objectivity but avoids "fly specking." *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir.1974). This Court also notes that, although NEPA requires agencies to consider and respond to the comments and concerns expressed by the public and other federal agencies, NEPA does not require that those agencies necessarily agree. 40 C.F.R. § 1503.1.

In this case, the AR verifies that Defendants identified possible noise impacts on sensitive areas, including the effects of overflights on beef cattle, dairy cows, sheep, pigs, horses, mink, dogs, chickens, turkeys, migratory birds, predatory birds, and other wildlife within the RBTI area. The AR also indicates that Defendants amply considered the concerns expressed by the public and other agencies; and Defendants candidly acknowledged that adverse impacts were possible but reasonably determined, after considering public and agency comment alike, that any addi-

tional impact on these areas would be minimal. Further, the AR indicates that the RBTI adopted specific measures to mitigate possible impacts on sensitive areas, such as raising minimum flying altitudes and minimizing numbers of special use land areas overflown, as well as providing information to the public concerning the claims process if livestock should be injured.

In addition, the FEIS reveals that endangered/threatened flora and fauna species lists were obtained by Defendants from, *inter alia*, the United States Fish and Wildlife Service ("USFWS"), the New Mexico Department of Game and Fish, and the Texas Parks and Wildlife Department. The AR also reveals that Defendants consulted with the USFWS on an ongoing basis concerning actions which overlapped the RBTI area and that various state agencies were consulted in connection with species of specific concern to each state. The FEIS also reflected Defendants' avowal that "[c]ompliance with the Endangered Species Act for [the] RBTI has been and will continue to be part of the broader consultation effort."

Further, the FEIS sets forth the results of Defendants' analysis of the impact of aircraft emissions on threatened wildlife for each alternative. The analysis concluded that emissions would produce minimal quantities of criteria pollutants and that ground-level pollutants would be fractions of federal and state standards. Finally, the Court's holistic review of the AR reveals that Defendants consulted continuously with the USFWS throughout the RBTI NEPA process, including formal comments on the DEIS; a status meeting to discuss the endangered species issues; and numerous telephone conferences, letters, and e-mail communications.

While Plaintiffs are certainly entitled to disagree with Defendants' conclusions, this

Court finds that the AR belies Plaintiffs' allegations that Defendants ignored or otherwise failed to consider the adverse effects on the underlying ranchland, livestock, and wildlife. Indeed, although Plaintiffs disagree with Defendants' conclusions regarding the information contained in the AR, it is obvious to this Court that Defendants considered the issues raised and thereafter placed before the final decisionmaker adequate information from which to make an informed decision. This Court also notes that Defendants candidly acknowledged the potential of adverse effects to the underlying lifestock and wildlife. NEPA requires nothing more. See Robertson, 490 U.S. at 350, 109 S.Ct. 1835 (concluding that "[i]f the adverse environmental effects of · the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs").

As to Plaintiffs' claims that Defendants inadequately analyzed the safety issues raised during the scoping process regarding the effects of wake vortices generated by the RBTI aircraft, this Court's review of the AR reveals that Defendants used the results of actual test flights to establish the effects of wake vortices from B–52s flying at 300 feet AGL. In addition, the AR indicates that Defendants both narratively and pictorially addressed the issue of wake turbulence. Defendants' test flights demonstrated that vortex wind speeds at or near the surface would range from approximately 1.7 mph at 6 feet AGL, 2.0 mph at 50 feet AGL, 2.6 mph at 100 feet AGL, and 4.0 mph at 200 feet AGL. Using the Beaufort wind force scale as a benchmark, Defendants demonstrated that the effects of wake vortices at 1–3 mph would move leaves and drift smoke; at 4–7 mph the effects of wake vortices would rustle leaves and cause wind to be felt on the face.

Nevertheless, in contrast, Defendants candidly acknowledged that wake turbulence directly behind an aircraft can cause handling difficulties for following aircraft, especially when a smaller aircraft trails a larger aircraft. However, Defendants correctly pointed out that FAA regulations dictate safe following distances and procedures to avoid wake turbulence, both in flight and during landing or takeoff.

For each of these reasons, this Court finds that Defendants reasonably concluded that wake turbulence was not expected to significantly affect the safety of people, vehicles, or structures within the RBTI area. This Court also finds that Defendants' test flights—a series of three tests conducted from 1970 through 1986—did not constitute a flawed methodology for analyzing the effects of wake turbulence or that Defendants' discussion of the issue was inadequate. This Court is convinced that Defendants satisfied NEPA's burden regarding the potential effects of wake vortex and provided detail "sufficient to enable those who did not have a part in [the EIS's] compilation to understand and consider meaningfully the factors involved." Envtl. Def. Fund, Inc., 492 F.2d at 1136.

This Court also finds similarly unavailing Plaintiffs' assertions that Defendants inadequately analyzed the socioeconomic effects of the RBTI. Although CEQ regulations require agencies to ensure the professional and scientific integrity of environmental information and emphasize the need for multidisciplinary analysis, 40 C.F.R. §§ 1500.1(b) and 1502.24, "economic and social impacts clearly occupy a lesser tier of importance in an EIS than do purely environmental or ecological concerns." Ass'n Concerned About Tomorrow, Inc. v. Dole, 610 F.Supp. 1101, 1111 (N.D.Tex.1985).

Here, Plaintiffs argued that the socio-economic analysis in the FEIS was inaccurate, incomplete, and in violation of NEPA. However, this Court notes that the AR reveals that Defendants (1) relied on noise impact analyses to measure the impacts of the RBTI on residential and recreational land use; (2) utilized relevant population, housing, employment, and earnings data; and (3) discussed comparative residential valuation data and tourism earnings data in each region of influence. Because NEPA only requires a "reasonably thorough discussion that fosters informed decisionmaking, not a complete evaluation," *Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1462 (9th Cir.1984) (internal quotations omitted), it appears to this Court that Defendants have more than met NEPA's requirements to discuss the relevant socioeconomic impacts of the RBTI.

In addition, the Fifth Circuit has long held that the "[d]etermination of economic benefits and costs that are tangential to environmental consequences are within th[e] wide area of agency discretion." *S. La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980). NEPA requires, at most, "a narrowly focused, indirect review of the economic assumptions underlying a federal project described in an impact statement." *Id. See also Sierra Club v. Sigler*, 695 F.2d 957, 974–75 (5th Cir.1983) (finding that an agency need only consider "important" information relevant to a "significant" effect not based on "unreasonable speculation"); *Town of Norfolk v. United States EPA*, 761 F.Supp. 867, 887–88 (D.Mass.1991) (holding that the failure to place a dollar value on a possible decrease in property value was not unreasonable); *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C.Cir.1981) (finding that, if adverse environmental impacts are unlikely and the EIS identifies areas of uncertainty, studies are not necessary and the agency has fulfilled its mission under NEPA); *Envtl. Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1375 (10th Cir.1980) (concluding that NEPA does not contemplate detailed discussions of environmental effects which are deemed remote, which are only speculative possibilities, and which cannot be readily ascertained). Here, the Court finds that Defendants adequately identified and discussed all of the non-speculative socioeconomic impacts reasonably foreseeable and related to the RBTI.

While the Court is cognizant that neither NEPA nor the CEQ regulations define "cost/benefit analysis," the Fifth Circuit has concluded that a cost/benefit analysis "varies from a formal analysis in which all costs and benefits are quantified in an identical unit of measurement ... and compared, to an informal analysis where costs and benefits are identified, quantified if possible, and balanced." *Sigler*, 695 F.2d at 976–77 n. 15. In fact, a "more informal analysis is preferred 'when there are important qualitative considerations.'" *Id. See also* 40 C.F.R. § 1502.23 (providing that "the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and *should not be* when there are important qualitative considerations") (emphasis added).

Finally, a court must consider "whether the economic considerations, against which the environmental considerations are weighed, were so distorted as to impair fair consideration of those environmental consequences." *S. La. Envtl. Council, Inc.*, 629 F.2d at 1011. "In other words, the agency is free to take the most environmentally costly course of action or alternative, so long as the environmental impact is fully identified in the EIS and the agency determines that 'other values' outweigh the impact on the environment." *Citizens Concerned About Jet Noise v.*

*Dalton,* 48 F.Supp.2d 582, 589 (E.D.Va. 1999).

Here, this Court is persuaded that Defendants conducted an appropriate informal weighing of the merits and drawbacks of the RBTI consistent with Defendants' reasonably stated purpose and need. The AR repeatedly indicates that the thrust of the RBTI was to provide integrated airspace to maximize quality training time and to minimize unproductive transit time. Plaintiffs have not established that Defendants' proposed action was primarily driven by economic considerations or that Defendants painted a picture of unduly optimistic economic benefits while simultaneously minimizing the potential adverse environmental consequences. Thus, this Court is convinced that a formal cost/benefit analysis was not required.

Because Defendants were not required to prepare a formal cost/benefit analysis, Defendants were not required to assign specific dollar values to the expected benefits of the RBTI. Rather, Defendants were required to balance the favorable and adverse effects of the agency action, and this Court finds that Defendants did so. A review of the AR and FEIS indicates that Defendants conducted a reasonably thorough discussion of the significant aspects of the environmental and economic factors of the RBTI and that Defendants did not justify their decision based on economic considerations. Nothing more was required.

In addition, because Defendants were entitled to rely on their own experts, so long as the experts' decisions were not arbitrary and capricious, "the mere presence of contradictory evidence does not invalidate the [a]gencies' actions or decisions." *Wyo. Farm Bureau Fed'n v. Babbitt,* 199 F.3d 1224, 1241 (10th Cir.2000). "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Or. Natural Res. Council,* 490 U.S. at 378, 109 S.Ct. 1851. *See also Price Rd. Neighborhood Ass'n, Inc. v. United States DOT,* 113 F.3d 1505, 1511 (9th Cir.1997) (rejecting attempts to engage in a battle of the experts); *Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) (refusing to decide which experts had more merit). This Court is convinced that Defendants' level of expertise enabled Defendants to reasonably evaluate the studies prepared by the experts involved and to appropriately determine the applicability of such studies to different situations, including the RBTI.

Although this Court recognizes that Plaintiffs do not agree with Defendants' experts concerning the RBTI's potential socioeconomic impacts, this Court finds that Defendants' analysis adequately details the reasonably foreseeable economic impacts of the RBTI and that the FEIS is supported by evidence sufficient to foster informed public participation and reasoned decisionmaking. "NEPA does not require an agency to take the action that is the most compatible with [the] environment, nor does it permit a court to substitute its judgment for that of the agency on the wisdom of the action taken by the agency." *Sigler,* 695 F.2d at 977. Accordingly, because the Court "should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable," *ITT Federal Services Corp.,* 45 Fed. Cl. at 184, this Court "will not displace the [agency's] choice between conflicting views." *Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1039 (10th Cir.2001).

This Court is also persuaded that Lubbock, Texas, officials were fully apprised of

Defendants' NEPA progress and, indeed, were invited by Defendants to participate in the EIS process. This Court also finds that the City of Lubbock, which is not located beneath either the Lancer MOA or MTR IR–178, will not suffer any direct physical environmental effect and, at most, only indirect socioeconomic effects. Consequently, this Court finds that Defendants were not required to further analyze the socioeconomic impacts in order to meet the requirements of NEPA. *See Image of Greater San Antonio v. Brown,* 570 F.2d 517, 522 (5th Cir.1978) (making clear that socioeconomic impacts alone, without a physical effect upon the environment, do not trigger the requirements to perform a NEPA analysis).

Finally, with regard to Plaintiffs' claims that Defendants failed to consider the FAA's input regarding the effects of the RBTI on airspace use and management, this Court's review of the AR and FEIS shows that Defendants adopted several mitigation measures which specifically addressed concerns voiced by the public regarding the potential for conflicts with civil aviation in the RBTI area. Proactive solutions were adopted by Defendants (1) to establish the floor of the Lancer MOA above the minimum altitudes for all airports under or adjacent to the MOA; (2) to establish a military radar unit to allow easier access and real-time communications to avoid potential conflicts between military and general aviation aircraft in local airspace; and (3) to increase communications with local aviators via a toll-free number with airspace schedule information.

The Court also finds that Plaintiffs' speculation that increased noise levels might result from changing the MOA boundaries to accommodate the busy times of the Dallas/Fort Worth and Houston airports was adequately addressed by Defen-

dants in the context of the RBTI's noise analysis, especially in light of Defendants' discussion of the Ldn cumulative methodology which accounts for a twenty-four-hour period of time. In addition, this Court notes that the AR incorporates numerous "Special Operating Procedures" relevant to IR–178. The "Special Operating Procedures" direct aircraft to avoid additional noise sensitive areas, including residences, towns, private airstrips, and municipal airports.

This Court also agrees that, consistent with the independent processes followed by Defendants in compliance with NEPA and the FAA's independent processes with regard to approval of the relevant airspace, Defendants fully complied with the timing requirements set forth by CEQ regulations. Moreover, relevant to Defendants' airspace use and management of the Lancer MOA, Defendants included in the AR (1) the Fort Worth Air Route Traffic Control Center ("ARTCC") review of Alternative C recommending that Alternative C not be considered for RBTI implementation; (2) the Fort Worth ARTCC review of Alternative B recommending that Alternative B be implemented with changes to the MOA boundaries and operating hours so as not to conflict with commercial traffic to and from Dallas and Houston; (3) the Albuquerque Center's opinion that Alternatives B and C were the best options; (4) the Houston Center's Airspace Impact Analysis of the Texon MOA/ATCAA; (5) the Midland Air Traffic Control Tower's ("ATCT") Airspace Impact Analysis of the RBTI; and (6) the Abilene ATCT Informal Airspace Impact Analysis for the RBTI.

In light of the six analyses cited immediately above, as well as Defendants' mitigation measures taken to specifically address the concerns voiced by the public regarding the potential for conflicts with civil

aviation in the RBTI, there can be no doubt that Defendants did, in fact, consider the use and management of the Lancer MOA airspace in conjunction with the implementation of the RBTI. In addition, Defendants correctly point out that (1) the FAA is the final approval authority for special use airspace and cannot take a position on any particular special use airspace proposal prior to the completion of the NEPA and aeronautical processing phases, *see* FAA Handbook 7400.2D, *Procedures for Handling Airspace Matters;* and (2) Plaintiffs have failed to show that Defendants' post-ROD consideration of the FAA's Final Aeronautical Study regarding the use of the Lancer MOA/ATCAA in any way violated the timing requirements of NEPA. *See* 40 C.F.R. § 1506.10.

This Court is persuaded, therefore, that Defendants took a hard look at the potential adverse environmental consequences of the RBTI and, when judged against the rule of reason, fully complied with the action-forcing procedures of NEPA.

### B. Public Comments

Plaintiffs complain that Defendants overlooked substantive comments from the public, other agencies, and its own experts. Plaintiffs argue that Defendants, without meaningful discussion, summarily dismissed legitimate criticisms regarding the impacts of the RBTI on ranching operations, the presence of unburned fuel emissions, the effects of wake vortices and jet blasts on people and ground structures, and the potential to adversely impact property values.

Defendants respond by arguing that the scoping process ran from publication of the Notice of Intent on December 19, 1997, through April 3, 1998. Throughout that time, public meetings were held in nine locations across western Texas and northeastern New Mexico, as well as in La Junta, Colorado, and Harrison, Arkansas. Thereafter, Defendants contend that more than 900 copies of the DEIS were sent to agencies, the public, and various repositories, following which Defendants held another fifteen public meetings. As a result, Defendants received more than 1,500 oral and written comments regarding the DEIS.

With regard to Plaintiffs' accusation that Defendants failed to discuss the effects of the RBTI on ranching operations as raised by the public during the scoping process, Defendants argue that the FEIS was, in fact, modified in order to address the public's concerns and to clarify topics concerning biological resources. Defendants point out that the FEIS included additional information on data sources used in describing the affected environment, additional studies on the effects of aircraft overflights on wildlife and livestock, and, significantly, additional analysis regarding the possible impacts of the "startle effect" on livestock production, growth, and reproduction.

With regard to Plaintiffs' assertions that Defendants failed to address unburned fuel emissions, Defendants once again cite to the FEIS, which includes Defendants' disclosures regarding aircraft emissions, including type quantified down to the microgram. The FEIS indicates that Defendants considered a wide range of aircraft exhaust criteria pollutants, including analysis of volatile organic compounds, nitrogen oxides, carbon monoxide, sulfur oxides, total suspended particulates, ozone, and lead.

Finally, Defendants contend that the public's concerns regarding wake turbulence were adequately addressed and that, although Plaintiffs may disagree with Defendants' conclusion that wake vortices would have no significant impact, Defendants were free to adopt the reasonable conclusions of their own qualified experts.

### *Judicial Determination*

 In the FEIS, an agency must "discuss at appropriate points ... any responsible opposing view which was not adequately discussed in the [DEIS] and shall indicate the agency's response to the issue raised." *Id.* § 1502.9(b). However, an agency "need not set forth at full length, the views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official." *Citizens for Mass Transit, Inc. v. Adams,* 492 F.Supp. 304, 311 (E.D.La.1980).

After thorough review, the Court finds that the AR contains a plethora of documentation which belies Plaintiffs' arguments that Defendants failed to consider and/or respond to comments made by the public during the scoping process. Not only is the AR replete with examples of the more than 1,500 comments received by Defendants as a result of the scoping process, but the AR, FEIS, and ROD also reflect (1) specific responses to those who expressed concerns; (2) mitigation measures taken by Defendants in response to those concerns; (3) extensive clarification of the critiques regarding biological resources; (4) additional information on the data sources used in the affected environment, including aircraft pollutants; and (5) expanded analyses of the startle effect on livestock and wildlife.

This Court cannot agree with Plaintiffs' contentions that Defendants summarily dismissed the concerns expressed by those participating in the scoping process relevant to livestock, unburned fuel emissions, the effects of wake vortices and jet blasts, and the potential impact on property values. For the most part, it appears to this Court that Plaintiffs' arguments taking issue with Defendants' responses to public comments merely re-urge Plaintiffs' previous arguments relevant to Defendants'

failure to take a hard look at the environmental consequences of the RBTI. Therefore, to the extent applicable to Plaintiffs' issues with regard to livestock, wake vortices, and property values, the Court directs the parties to the Court's discussion set forth *supra* in "A. Hard Look."

This Court also is not persuaded by Plaintiffs' contention that Defendants summarily dismissed criticisms regarding aircraft emissions for each of the alternatives considered under the RBTI. Indeed, the FEIS indicates that Defendants considered a wide range of aircraft exhaust criteria pollutants, including analysis of volatile organic compounds, nitrogen oxides, carbon monoxide, sulfur oxides, total suspended particulates, ozone, and lead. The AR clearly reflects pollution studies which showed that, although emissions from military aircraft would increase slightly in Alternative B, such emissions would be highly dispersed, would not noticeably degrade air quality, and would contribute only fractions of the allowable amounts set forth under federal standards. Accordingly, this Court finds that Defendants appropriately considered and responded to responsible opposing views. Thus, Plaintiffs have presented no basis for setting aside the FEIS based on Defendants' failure to adequately respond to public comments.

### *C. Mitigation Measures*

Plaintiffs complain that Defendants' FEIS provided only a perfunctory listing of possible mitigation measures which lacked supporting data. In addition, Plaintiffs claim that the mitigation measures agreed to between Defendants and the FAA were improperly developed outside the NEPA process, were not subject to public scrutiny, and completely failed to provide appropriate mitigation measures for wildlife, impacts on property values,

damages from wake vortices, and livestock and ranching impacts.

Defendants respond that the FEIS specifically articulated mitigation measures to reduce the potential for adverse effects pertinent to aircraft and airspace operations, land use, cultural resources, and biological resources. Further, Defendants argue that the mitigation actions in the FEIS detailed a summary of the community/agency concerns, the types of action to be taken, the resultant environmental outcomes, the agencies responsible for the actions, and the time frame within which each action was to be implemented. Finally, Defendants argue that the ROD also contained a discussion and description of the mitigation measures and management actions to be taken.

### *Judicial Determination*

■ An EIS must discuss mitigation in detail sufficient to ensure that environmental consequences have been fairly evaluated but need not contain a complete mitigation plan that is actually formulated and adopted. *Robertson,* 490 U.S. at 352, 109 S.Ct. 1835. *See also Laguna Greenbelt, Inc. v. United States DOT,* 42 F.3d 517, 528 (9th Cir.1994) (determining that NEPA does not require a fully developed plan which mitigates all environmental harm before an agency can act). "Even more significantly, it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson,* 490 U.S. at 353, 109 S.Ct. 1835.

For purposes of NEPA, "mitigation" is defined to include

A. Avoiding the impact altogether by not taking a certain action or parts of an action.

B. Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

C. Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

D. Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

E. Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20.

In addition, the Court notes that regulations governing "minimum safe altitudes" specifically proscribe the following:

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

* * *

(b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.

(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

14 C.F.R. § 91.119(b)-(c).

First, this Court notes that § 91.119 does not specify a minimum altitude for flights over sparsely populated areas so long as the aircraft are no "closer than 500 feet to any person, vessel, vehicle, or structure." *Id.* Thus, military aircraft may fly below an altitude of 500 feet in a remote or "sparsely populated" MTR or MOA and still be within navigable airspace under the

conditions permitted by the regulation. *Id.*

Second, Defendants have identified the unavoidable impacts of the low-level overflights of the RBTI and have conducted a serious and thorough evaluation of the environmental mitigation options for the RBTI in accordance with NEPA's process-oriented requirements. The AR reveals that certain of Defendants' mitigation measures included (1) limiting annual sortie operations to 1,560/year; (2) increasing communications opportunities with civil aviators by creating a toll-free number to Dyess AFB for airspace schedule information; (3) establishing a military radar unit and real-time communications between military and general aviation aircraft; (4) reducing the potential for conflict between military flights and local aviation in the vicinity of the proposed reentry route on IR–178 by raising the floor of the reentry route to 6,000 feet MSL; (5) developing alternate locations for siting of en route ESS; and (6) limiting aircraft overflights to 5,000 feet AGL or higher when within three nautical miles of an en route ESS.

Third, this Court finds that Plaintiffs' burden is not just to point out possible errors in Defendants' assumptions and methodology but to prove that the decisionmaker did not have the information necessary to make an informed decision. Plaintiffs have not done so.

Here, Defendants balanced the effects of the RBTI with the training and operational considerations needed to perform the functions of the RBTI, discussed mitigation measures in detail sufficient to ensure that the environmental consequences had been fairly evaluated, and ensured that the decisionmaker had adequate information to make an informed decision. Thus, this Court finds that Defendants have satisfied NEPA's requirements.

### D. Untimely Participation of FAA

Plaintiffs complain that Defendants issued the FEIS and ROD without the requisite input from the appropriate cooperating agency, the FAA. Plaintiffs argue that Defendants did not timely involve the FAA in the NEPA process and failed to engage the FAA in pre-DEIS steps and the scoping process. Plaintiffs contend that this significant procedural flaw renders the FEIS and ROD fundamentally deficient as a matter of law.

Defendants respond that the FAA was included in the RBTI on an informal basis as early as December 1997 as part of the "Interagency and Intergovernmental Coordination for Environmental Planning" ("IICEP") process. Defendants assert that not only was the FAA notified of the RBTI proposal at that time, but the agency was invited to assist in analyzing the potential impact of the RBTI and to voice any specific concerns the FAA had about the RBTI proposal. Defendants point out that the FAA first responded in January 1998 and thereafter maintained active participation in the NEPA RBTI process, beginning with attendance at the public scoping meetings and continuing through the issuance of its Formal Aeronautical Study dated July 28, 2000. Indeed, with respect to the RBTI, Defendants argue that not only did Defendants fully comply with the timing requirements provided in NEPA, but Defendants included the FAA in the process earlier than in the majority of past cases.

### Judicial Determination

CEQ regulations require that an agency request comments from other federal agencies, appropriate state and local agencies, the public generally, and interested or affected persons or organizations. 40 C.F.R. § 1503.1. The agency shall "[r]equest the participation of each cooperating

agency in the NEPA process at the earliest possible time." *Id.* § 1501.6(a)(1). However, no decision on the proposed action shall be made by the agency until the later of (1) ninety days after publication of the DEIS; or (2) thirty days after publication of the FEIS. *Id.* § 1506.10.

As to Plaintiffs' contention that Defendants failed to adequately consider the FAA's input, this Court is convinced that Defendants timely engaged the FAA in the EIS process. The AR clearly indicates the inclusion of the FAA as part of the IICEP process as early as December 1997. The FAA initially responded in January 1998 and thereafter maintained an active participatory role which began with attendance at the public scoping meetings and culminated with the issuance of the FAA's Final Aeronautical Study in July 2000.

Moreover, CEQ regulations proscribe Defendants from making a decision until ninety days after publication of the notice of the DEIS or until thirty days after publication of the notice of the FEIS. Here, the AR reveals that the notice for the DEIS was published on March 30, 1999, and that the notice for the FEIS was published on February 1, 2000. Because the ROD was signed in April, 2000, this Court finds that Defendants fully complied with the timing requirements under NEPA; and because the FAA's independent Formal Aeronautical Study was not issued until July 28, 2000, the Court finds that Plaintiffs are incorrect in insisting that the study should have been a part of the RBTI AR before the decisionmaker. Consequently, this Court concludes that Plaintiffs' claims that the FAA was not timely involved in the NEPA RBTI process and that Defendants failed to consider the FAA's input are without merit.

### E. Baseline/Alternatives

Plaintiffs contend that, from its inception, the RBTI's purpose and need analysis was conducted using artificially inflated baseline numbers, particularly with regard to the operation and use of IR–178. Consequently, Plaintiffs complain that Defendants failed to consider alternatives which would have otherwise satisfied greatly reduced rates of utilization by the RBTI. Plaintiffs claim that Defendants' failure to properly evaluate the baseline numbers appropriate for the No Action alternative skewed the results of Defendants' FEIS analysis and violated the mandates of NEPA.

Defendants respond that the 1,560 sortie operations baseline for Alternative B, IR–178, was properly reflected in both the DEIS and the FEIS. Defendants contend that the actual counts of aircraft activities were based on scheduling and usage information which was maintained by airspace managers from Cannon, Barksdale, Dyess, Tinker, and Holloman AFBs. In addition, the German Air Force training activities within the RBTI study area were counted as part of the baseline. Defendants also incorporated projected sortie operations in secondary airspace because the projected operations were scheduled for implementation prior to implementation of the RBTI. Finally, Defendants included force structure changes projected for implementation prior to the finalization of the RBTI.

Because the FEIS narratively described and graphically illustrated the breakdown of the RBTI's sortie operations, including numbers, sources, and projections included in the baseline for Alternative B, IR–178, Defendants argue that the baseline was not unclear, misleading, or deceptive and did not improperly skew Defendants' evaluation of reasonable alternatives to fulfill the RBTI's purpose and need.

### Judicial Determination

The CEQ intended that agencies compare the potential impacts of a proposed

major federal action to the known impacts of maintaining the status quo. *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir.1997). In other words, requiring consideration of the No Action alternative constitutes use of the current level of activity as a benchmark. *See* Forty Most Asked Questions Concerning CEQ's [NEPA] Regulations, 46 Fed.Reg. 18,026 (Mar. 23, 1981). However, while informed and meaningful consideration of reasonable alternatives is an integral part of the statutory scheme, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir.1998), this Court notes, and Plaintiffs specifically acknowledge, that "[a] baseline is not an independent legal requirement." 54 Fed.Reg. 23,756 (1989).

The Court also notes that even though NEPA is rigorous in its requirements, it does not require perfection or the impossible. *Envtl. Defense Fund v. Tenn. Valley Auth.*, 492 F.2d 466, 468 n. 1 (6th Cir.1974) (citations omitted). "[N]o matter how well the EIS has been written, someone later can always find fault with it." *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 265 (6th Cir.1977). "This does not mean that every [EA] containing factual inaccuracies will have to be redone." *Van Abbema v. Fornell*, 807 F.2d 633, 643 (7th Cir.1986). Here, as in all proposed major federal actions, the EIS is intended to provide the decisionmaker "with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process." *Northwest Res. Info. Ctr., Inc.*, 56 F.3d at 1064.

In order to assess Plaintiffs' complaints *vis-à-vis* Defendants' presentation of the various baseline operations information while adhering to a pragmatic standard which requires good faith objectivity but avoids "fly specking," *Lathan*, 506 F.2d at 693, this Court specifically considered the adequacy, practicability, and reasonableness of Defendants' baseline information and balanced Defendants' information against Plaintiffs' specific objections, as well as the broad purposes of NEPA. The Court also considered counsel's oral arguments presented on January 29, 2003, regarding the appropriate baseline.

With respect to Plaintiffs' claims that Defendants' artificially inflated baseline numbers skewed, *inter alia*, the outcomes of related noise analyses, this Court finds that Defendants' figures as to the scheduled and actual operations of the No Action alternative reasonably represented the status quo against which the remaining alternatives under the RBTI could be compared. This Court believes that the alleged disparity, if any, between the scheduled and actual sortie operations of Alternative A was not of such significance that the numbers misled the decisionmaker and/or the public when comparing the No Action alternative against the three remaining RBTI alternatives under consideration.

While this Court is cognizant that Defendants have a duty to ensure the accuracy of the information placed before the decisionmaker, *Van Abbema*, 807 F.2d at 642, this Court is not convinced that Defendants were indifferent to the facts or that Defendants' presentation of the baseline information was conflicting, inconsistent, overinclusive, underinclusive, contradictory, arbitrary, capricious, and/or purposefully included inaccurate data. Even assuming, *arguendo*, that Plaintiffs' allegations with regard to any alleged discrepancies were true, Plaintiffs have failed to establish that such discrepancies would have materially affected the decisionmaker's evaluation of the RBTI.

Therefore, this Court finds that Plaintiffs' allegations with respect to the AR's inadequate baseline must fail.

The regulations governing an agency's consideration of "[a]lternatives including the proposed action" provide that

[t]his section is the heart of the [EIS]. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

■ "'Reasonable alternatives' are those that meet the underlying purpose and need for the proposed action and that would cause a reasonable person to inquire further before choosing a particular course of action." 32 C.F.R. § 989.8(b). Thus, the FEIS must provide "a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action." *Natural Res. Def. Council, Inc. v. Morton,* 458 F.2d 827, 833 (D.C.Cir. 1972). "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Simmons v. United States Army Corps of Eng'rs,* 120 F.3d 664, 670 (7th Cir.1997).

Of course, this Court recognizes that an agency's discussion of environmental effects need not be an exhaustive "crystal ball" inquiry; but Defendants are required to present sufficient information to permit a reasoned choice of alternatives. *Natural Res. Def. Council, Inc.,* 458 F.2d at 836–37. Here, the FEIS indicates that Defendants examined seventy-two routes within approximately 600 nautical miles of Dyess and Barksdale AFBs. Of those seventy-two routes, Defendants carried forward three action alternatives which met the 600 nautical mile radius limitation, the slope and terrain variability requirement, and the 50 nautical mile low-angle line-of-sight ESS accessibility.

Although coarse and fine screening by Defendants indicated that Alternatives B and C had approximately equal potential for being identified as the preferred operational alternative, input from the FAA indicated that the modification and increased use of the proposed Texon MOA/ATCAA within Alternative C(1) could significantly impair IFR traffic; (2) would require rigid management with little or no capability to support any flight changes or delayed op-

erations; (3) would necessitate rerouting of civil and commercial aircraft using affected jet routes and federal airways; and (4) could possibly require restructuring of the airspace. Consequently, Defendants determined that the operational flexibility of Alternative C would be limited.

In contrast, Defendants' analysis of the proposed Lancer MOA/ATCAA indicated that action Alternative B offered considerable flexibility and was better suited to support the RBTI's training activities with less potential interference with other aviation in the area. The AR showed that the FAA indicated to Defendants that, although Alternative B might require rerouting of civil and commercial aircraft, the amount of traffic would be minimal, would be easily accommodated, and would allow less constrained flow into and out of the training airspace. Consequently, Defendants selected Alternative B as the preferred operational alternative.

The FEIS then indicates that Defendants conducted—independently of the preferred operational alternative—an evaluation of the three action alternatives to determine the environmentally preferred alternative. Coarse screening revealed that Alternatives B and C each had the potential for fewer and lower magnitude environmental impacts than Alternative D and each had equal potential for being the environmentally preferred alternative. Fine screening, however, indicated that Alternative B would necessitate substantially less new airspace than Alternative C and the number of cultural resources potentially affected by the construction of the threat emitter sites and ESS would be one fewer under Alternative B.

Although Defendants' fine screening of the environmental impacts revealed minor differences in the potential environmental consequences of Alternatives B and C, Alternative B did offer somewhat less poten-

tial for adverse environmental impacts, because, among other things, modification of the existing MOAs to form the Lancer MOA decreased the land area underneath by 801,501 acres. Thus, Alternative B was minimally preferable to Alternative C. However, when considered in conjunction with Alternative B's *operational* superiority, Defendants selected Alternative B as the RBTI's preferred action alternative.

■ In the final analysis, NEPA's requirement with regard to an agency's consideration of alternatives is subject to a rule of reasonableness. The rule of reason "guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 201 F.3d 1186, 1200 (9th Cir.1999) (quoting *City of Carmel-by-the-Sea v. United States DOT*, 123 F.3d 1142, 1155 (9th Cir. 1997)). Under the rule of reason, Defendants need not consider an infinite range of alternatives, only reasonable ones. 40 C.F.R. § 1502.14(a). NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.... What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Colo. Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir.1999) (quoting *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir.1992)).

"An [EIS] may not be held insufficient by a court merely because the agency has failed to discuss in it every conceivable alternative to the proposed project." *Ass'n Concerned About Tomorrow, Inc. v. Slater*, 40 F.Supp.2d 823, 832 (N.D.Tex. 1998) (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 554, 98 S.Ct. 1197, 55

L.Ed.2d 460 (1978)). NEPA requires only that reasonable alternatives be evaluated. NEPA § 4332(2)(C). Alternatives that do not accomplish the purpose of an action are not reasonable. *Colo. Envtl. Coalition,* 185 F.3d at 1174–75. *See also City of Bridgeton v. FAA,* 212 F.3d 448, 456 (8th Cir.2000).

Applying the above criteria and the rule of reason to Plaintiffs' claims that Defendants considered an insufficient range of alternatives, as well as to the oral arguments presented by counsel regarding alternate basing, this Court first looked to the intended purpose of the RBTI. *See Colo. Envtl. Coalition,* 185 F.3d at 1174–75. The primary purpose of the RBTI is to establish linked training assets which maximize the realistic training time of combat bomber aircrews.

The FEIS specifically discusses the training criteria against which each alternative was evaluated and also explains that Alternatives A, C, and D were eliminated from further detailed consideration because those alternatives did not best satisfy the RBTI's integrated training requirements, *i.e.,* the very purpose of the RBTI. For those alternatives which Defendants eliminated, the EIS need only briefly discuss the reasons for the alternative having been eliminated. 40 C.F.R. § 1502.14(a). "[A]gencies must be free to make reasonable limitations on the scope of their discussions of such alternatives." *Slater,* 40 F.Supp.2d at 833.

Here, the FEIS demonstrates that Defendants compared the impacts of Alternative B with the impacts of continuing to fly in the existing, unchanged MTRs and MOAs, *i.e.,* the No Action alternative. This Court also finds that the AR sets forth reasonable training criteria for the RBTI and that the AR demonstrates that Defendants sufficiently (1) defined the objectives of the RBTI; (2) identified alternatives that would accomplish those objectives; and (3) took a hard, comparative look at the environmental impacts associated with each reasonable alternative, including the No Action alternative. This is all the law requires. 40 C.F.R. § 1502.14.

Accordingly, this Court finds that the analyses of alternatives were presented in sufficient detail, were supported by the balance of the AR, and were adequately assessed by Defendants so as to comply with NEPA.

Thus, consistent with the Court's findings *supra* regarding the adequacy of Defendants' baseline, this Court finds that Plaintiffs' claims that Defendants failed to incorporate an appropriate No Action and baseline for evaluation of the effects of the RBTI must fail.

## F. IR–178

Plaintiffs claim that Defendants' 1985 and 1994 EAs prepared for IR–178 are outdated, do not reflect current conditions or impacts, have not been adequately supplemented as required by law, and otherwise do not comply with NEPA's requirements. Plaintiffs challenge the adequacy of the 1985 and 1994 NEPA analyses relied on by Defendants in making numerous subsequent modifications to IR–178's flying operations. Specifically, Plaintiffs complain that Defendants did not adequately consider the impacts of the RBTI on civilian aviation or the effects on underlying landowners and land uses in light of the significant changes to the RBTI study area since the time of the earlier NEPA assessments. Plaintiffs insist that Defendants be ordered to supplement the earlier EAs with regard to modifications which have occurred to IR–178 since March 1995.

Defendants argue that Plaintiffs have failed to identify any action taken by Defendants in connection with IR–178 that

would have caused environmental impacts sufficient to trigger NEPA analysis or supplementation. Defendants specifically rely on the AR's supplemental summary of changes made to IR–178 between March 1995 and March 2001, which indicates that many of the modifications to IR–178 were minor administrative changes. Because Plaintiffs cannot point to any IR–178 major action (or nonmajor IR–178 action which had a significant impact on the environment), Defendants challenge Plaintiffs' unsupported blanket assertion that additional NEPA analysis was required relevant to IR–178.

Further, Defendants contend that Plaintiffs' failure to identify particular actions which occurred within the applicable period of limitations, *viz.*, from March 1995 to March 2001, demonstrates that Plaintiffs lack standing to claim, under the guise of "ongoing agency action," deficiencies with regard to EAs conducted in 1985 and 1994. Defendants insist that, by allowing Plaintiffs to indirectly challenge final agency actions which occurred in the past by now claiming that insufficiencies in the original analyses demonstrate an ongoing need to supplement, Plaintiffs are attempting to circumvent the prospective provisions embraced by NEPA. Defendants contend that Plaintiffs' reactive arguments, applied retroactively, would, in essence, ensure that an agency was never able to complete the NEPA process. In any event, Defendants note that many of the changes to IR–178 of which Plaintiffs complain actually *reduced* the environmental impact of the MTR; *i.e.*, many changes involved raising the floor and ceiling on segments of IR–178 thereby reducing the adverse noise impacts to the underlying areas.

Finally, Defendants argue that Plaintiffs' insistence that a full chapter in the FEIS should have been devoted to a description of the affected environments for each alternative is misplaced. Defendants contend that NEPA requires nothing more than a succinct description, no longer than necessary, of the areas under consideration. Because the FEIS contains a comprehensive description of the overall regional environment encompassed by all of the alternatives, as well as a summary description of the affected environment for each alternative, Defendants argue that they have fully satisfied NEPA's requirements.

### *Judicial Determination*

█ "The purpose of an EA is to 'provide sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992) (quoting *Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir.1985)). *See also* 40 C.F.R. § 1508.9(a)(1). An EA will come to one of two findings: "either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact (a 'FONSI') necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS." *Sabine River Auth.*, 951 F.2d at 677.

When an agency concludes that preparation of an EIS is not necessary, the decision may be challenged under the APA. *Id.* The legal standard relevant to a decision whether to prepare a supplemental EIS is "essentially the same as the standard for determining the need for an original EIS," *i.e.*, arbitrary and capricious. *Id.* (citing *Fritiofson*, 772 F.2d at 1239 n. 8). To determine whether the decision is arbitrary and capricious, the Fifth Circuit has consistently held that an "EIS is 'not required for *non* major action or a major action which does not have *significant* impact on the environment.'" *Id.* (quoting *Sierra Club v. Hassell*, 636 F.2d 1095, 1097

(5th Cir. Unit B 1981)) (emphasis in original).

Here, the Court's review of the AR's supplemental summary of actions within IR–178 between March 1995 and March 2001 indicates that no major actions occurred which would have had a significant impact on the environment thereby necessitating the preparation of an EIS. Moreover, as Defendants correctly asserted, many of the actions actually reduced the impacts of the RBTI on the underlying area. Defendants' IR–178 supplementation included in the AR reveals that the alignment of IR–178 has remained substantially unchanged since its formation in 1991, any operational changes were minor and did not involve any new airspace, and most other changes were merely administrative and in no way affected the environment.

Plaintiffs have failed to point to any contrary evidence which would indicate that Defendants' decision not to supplement the 1985 and 1994 pre-RBTI EAs was arbitrary and capricious. Plaintiffs' suggestion that this Court revive the limitations period for the earlier EAs "would upset the balance struck by the limitations period between the reasonable needs of individual claimants and the public interest in finality." *Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 189 (4th Cir.1999).

In any event, the Court also notes that IR–178 necessarily underwent a thorough and complete environmental analysis as part of the baseline for the RBTI FEIS. A large portion of the FEIS was devoted to describing the effects of IR–178's ongoing operations—which do not significantly differ from the historic use of IR–178—on the underlying environment, the practical effect of which is to render moot Plaintiffs' complaints regarding the "outdated" nature of Defendants' NEPA documentation

relevant to IR–178. *See* APA § 706 (providing that "due account shall be taken of the rule of prejudicial error").

Moreover, the prospective nature of NEPA "insure[s] that environmental information is available to public officials before decisions are made and before actions are taken." 40 C.F.R. § 1500.01(b). Further, it is well established that NEPA "does not create a remedial scheme for past federal actions. It was enacted to require agencies to assess the future effects of future actions." *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 779, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983).

Here, this Court finds that Defendants have adequately assessed the future potential adverse environmental effects of the RBTI and IR–178. NEPA requires nothing more. Accordingly, this Court finds that Plaintiffs' insistence that Defendants be required to supplement the 1985 and 1994 EAs is without merit and would run afoul of NEPA's forward-looking design. Because Plaintiffs have failed to show that Defendants have been arbitrary and capricious, this Court will not intervene.

## CONCLUSION

This Court has made a conscientious effort to fully review the RBTI FEIS, ROD, AR and any allowed supplementation, and all other relevant data and material which was available to the decisionmaker, as well as each objection raised and counterargument made by the parties. In so doing, the Court has purposefully conducted its review with unwavering adherence to the important goals sought to be achieved by NEPA.

Although this Court finds that Defendants' documentation sometimes suffered from a slight subjective bias, the Court nevertheless carefully applied the rule of reason and practicality and fully consid-

ered the relevant environmental and economic factors presented by Defendants' AR, FEIS, and ROD. As a result, this Court is convinced that Defendants adequately considered the potential adverse environmental consequences of the RBTI.

In determining that Defendants have satisfied the requirements of NEPA, this Court finds that (1) Defendants in good faith objectively took a hard look at the environmental consequences of the proposed RBTI and alternatives; (2) the FEIS provided detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) the FEIS's explanation of alternatives was sufficient to permit a reasoned choice among different courses of action. Therefore, this Court finds that Defendants' decision to implement the RBTI was made in good faith after consideration of sufficient possible alternatives, mitigation measures, and other relevant factors and that the decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law. Therefore, after considering all the relevant arguments and evidence, this Court **DENIES** Plaintiffs' Motion for Summary Judgment.

Further, after considering all the relevant arguments and evidence, the Court **GRANTS** Defendants' Motion to Strike Extra–Record Declarations and Materials Attached to Plaintiffs' Motion for Summary Judgment; **GRANTS** Plaintiffs' Motion to Strike Defendants' Post Hoc Declarations of Bowles, Cormier, Skujins, and Fidell; and **GRANTS** Defendants' Cross–Motion for Summary Judgment.